# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br><br>AMIR REZA OVEISSI,                     )<br>                                                   )<br>            Plaintiff,                       )<br>                                                   )<br>    v.                                          )<br>                                                   )<br>THE ISLAMIC REPUBLIC         )<br>OF IRAN, *et al.*,                       )<br>                                                   )<br>            Defendants.                   )<br>_____ ) | Civil Action No. 03-1197 (RCL) |

## MEMORANDUM OPINION

This action arises from the death of Gholam Ali Oveissi, chief of the Iranian armed forces under the Shah's pre-revolutionary government, who was gunned down on a Paris street in February 1984. Plaintiff Amir Reza Oveissi, Gholam's grandson, alleges that agents of the Islamic Republic of Iran ("Iran") and its intelligence service, the Iranian Ministry of Information and Security ("MOIS"), carried out the murder. As sponsors of an extrajudicial killing, defendants Iran and MOIS are subject to suit under the Foreign Sovereign Immunities Act's ("FSIA") "state-sponsored terrorism" exception, 28 U.S.C. section 1605(a)(7).

## PROCEDURAL HISTORY

On June 2, 2003, plaintiff filed his original complaint [3] in this Court seeking, *inter alia*, compensation for his pecuniary losses, solatium, and punitive damages under the FSIA. On September 24, 2003, he requested [5] that the Clerk of the Court mail a summons and complaint to defendants via DHL Worldwide Express, a commercial delivery service requiring signed

receipts compliant with part (a)(3) of 28 U.S.C. section 1608, the statutory provision governing service of process in FSIA cases.  On August 2, plaintiff filed a DHL receipt as proof of service [9] and moved for entry of default [8].  Because the Court found the DHL receipt did not bear defendants' signatures, however, it denied [12] plaintiff's motion on January 12, 2005.

Meanwhile, the United States Court of Appeals for the District of Columbia Circuit and other judges of this Court issued several decisions relevant to plaintiff's claims.  These include, but are not necessarily limited to: *Acree v. Republic of Iraq*, 370 F.3d 41 (D.C. Cir. 2004); *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004); *Dammarell v. Islamic Republic of Iran*, No. 01-2224, 2005 U.S. Dist. LEXIS 5343 (D.D.C. Mar. 29, 2005) (Bates, J.) [hereinafter *Damarell II*]; *Holland v. Islamic Republic of Iran*, No. 01-1924, 2005 U.S. Dist. LEXIS 40254 (D.D.C. Oct. 31, 2005) (Kotelly, J.).  In light of these decisions, this Court ordered plaintiff [16] brief two issues: first, whether his claims as to each defendant must be rooted in state law, and second, whether he should be required to file an amended complaint.  Plaintiff addressed these issues in a memorandum of law [17] on December 30, 2005 and filed an amended complaint [19] the following day.

On March 31, 2006, plaintiff sought service of the amended complaint [26] through diplomatic channels pursuant to 28 U.S.C. section 1608(a)(4).  Service was executed [27] on May 30, 2006.  The Court conducted a bench trial on February 2, 2007, at which two witnesses testified - plaintiff and a man known as "Cyrus Tehrani."  Plaintiff's counsel also submitted the video deposition of Dr. Reuven Paz, an international terrorism expert.[1]  By April 7, 2007,

_____

[1] Dr. Paz directs the Project for the Research of Islamist Movements (PRISM), the GLORIA Center, and the Interdisciplinary Center in Herzliya, Israel.  He holds a PhD in Middle East History and Islam studies and has published extensively on Islamist international networks

defendants had neither entered an appearance nor filed any responsive pleading, and plaintiff submitted an affidavit for default [33].  The Clerk of the Court entered default [34] on April 9, 2007.

Nevertheless, this Court is obliged to inquire further before entering judgment against Iran and MOIS.  The FSIA mandates that a court may enter default judgment against a foreign state only once a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court."  28 U.S.C. § 1608(e).  Yet in assessing a plaintiff's claims, a court may accept his uncontroverted evidence as true and may rely on sworn affidavits.  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (Urbina, J.).  Moreover, the court "'may take judicial notice of related proceedings and records in cases before the same court.'" *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 263 (D.D.C. 2006) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 109 n.6 (D.D.C. 2005) (Bates, J.).  *See also* Fed. R. Evid. 201 (at any stage of a proceeding, a court may take judicial notice of facts not subject to reasonable dispute).  Having considered the entire record herein as well as certain factual findings this Court and others in this district have made in previous, related cases, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1.   Plaintiff Amir Reza Oveissi was born in Huntington Beach, California on May 30, 1979. (Rep Tr.)  He is now, and at all times pertinent to this action has been, a United States citizen.  (*Id.*)  He is the paternal grandson of decedent Gholam Ali Oveissi, who served as

---

and other subjects.  Plaintiff also submitted an article written by Magnus Ranstorp detailing the genesis and operating structure of Hezbollah, but as Dr. Paz's testimony amply documents Iran's links with that organization, the Court has not relied on this document.

a four-star general in Iran's armed forces until early 1979.  (*Id.*)

2.      Defendant Iran "is a foreign state and has been designated as a state sponsor of terrorism

pursuant to section 6(j)[,] of the Export Administration Act of 1979, 50 U.S.C. App. §

1405(j) continuously since January 19, 1984." *Weinstein v. Islamic Republic of Iran*, 184

F. Supp. 2d 13, 20 (D.D.C. 2002) (Lamberth, J.).  *See also Bodoff v. Islamic Republic of*

*Iran*, 424 F. Supp. 2d 74, 79 (D.D.C. 2006) (Lamberth, J.); *Mousa v. Islamic Republic of*

*Iran*, 238 F. Supp. 2d 1, 4 (D.D.C. 2001) (Bryant, J.); *Eisenfeld v. Islamic Republic of*

*Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000) (Lamberth, J.).

3.      Iran was re-founded as an Islamic Republic in 1979 when revolutionaries espousing an

extremist, theocratic ideology deposed the ruling Shah of Iran.[2]  *See Elahi v. Islamic*

*Republic of Iran*,124 F. Supp. 2d 97, 100, 101 (D.D.C. 2000) (Green, J.) (noting the

Shah's overthrow and Iran's establishment as a "clerical" regime).

4.      Since its inception, Iran has sponsored and orchestrated terrorist activities around the

world, including through its intelligence service, defendant MOIS.  *Id.* at 101.

5.      Terrorism expert Dr. Reuven Paz testified that following Israel's invasion of Lebanon in

June 1982, Iran dispatched agents to infiltrate the Shi'a Muslim community in southern

Lebanon.  He explained that Iran deemed the sect's then-current leadership too moderate

and secular and hoped to incite militant opposition to Israel's occupation.

6.      According to Dr. Paz, these Iranian agents founded a political organization among

---

[2] At the February 2, 2007 hearing, plaintiff contrasted his and his grandfather's view of
Islam with the fundamentalist approach advocated by the Iranian regime.  (Rep. Tr.)  "Cyrus
Tehrani" also testified that he was persecuted for his ties to the Shah's regime and for his belief
in secular government, and he described forced social changes imposed by the revolution's
clerical leadership.  (*Id.*)

southern Lebanon's Shi'a known as Hezbollah, or "Party of God." *Cf. Valore v. Islamic Republic of Iran*, 478 F. Supp. 2d 101, 105 (D.D.C. 2005) (Lamberth, J.) ("The formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran."); *Elahi*, 124 F. Supp. at 101 n.5 (referring to Hezbollah as an Iranian "surrogate organization[]").

7.     Dr. Paz further testified that in the early 1980s, members of Hezbollah, under the direction of MOIS, engaged in terrorist activities outside the Middle East using the nom-de-guerre "Islamic Jihad."[3]  These activities included assassinations of expatriate Iranian dissidents, mainly in France.  In Dr. Paz's opinion, the killings were intended to silence the Iranian regime's critics and to deter French intervention in Lebanon.  *See also Elahi*, 124 F. Supp. 2d at 101-02 (describing Iran's early efforts "to eliminate any effective opposition to the clerical regime by engaging in the widespread assassination of dissidents both within Iran and abroad").

8.     As well as guiding Hezbollah's terrorist activities, Iran, through MOIS and other entities, provided logistical support and training that, according to Dr. Paz, were crucial to Hezbollah's ability to carry out the assassinations.  Indeed, in his deposition, Dr. Paz characterized Hezbollah as an arm of the Iranian state.

---

[3] Hezbollah militants responsible for the 1983 United States Marine Barracks bombing in Beirut, Lebanon also referred to themselves as "Islamic Jihad."  *Damarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 271-72 (D.D.C. 2005) (Bates, J.).  In a related case brought by relatives of that bombing's victims against these same defendants, Judge Bates observed: "The terrorist group Islamic Jihad has been known by various names . . . [but] perhaps most commonly [as] Hizbollah."  *Id.*  As Judge Bates and this Court have both explained, "Hezbollah" and "Hizbollah" are merely variant transliterations of the same name.  *Id.* at 272 n.4; *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 248 n.1 (D.D.C. 2006) (Lamberth, J.).

9.  When the Shah was deposed in 1979, supporters of his government, including Gholam Ali Oveissi, fled the country.  (*See* Rep. Tr. (testimony of "Cyrus Tehrani" concerning Gholam Ali Oveissi's and his own reasons for leaving Iran)).  Gholam had previously received military training in the United States and initially traveled there before establishing a residence in Paris, France.  (*Id.*)

10.  Gholam's son and daughter-in-law also initially fled Iran to the United States, and their son, plaintiff Amir Reza Oveissi, was born during their stay in this country.  (*Id.*)  A few months later, they joined Gholam in Paris, where they shared an apartment with him. (*Id.*)

11.  Amir recalls that during his first five years, he and his grandfather were "almost always together."  (*Id.*)  Gholam accompanied Amir's father to pick Amir up from school each day, and he gave Amir Farsi lessons.  (*Id.*)  The family dined together each evening and enjoyed visits to the Louvre and to local parks.  (*Id.*)  Gholam acted as a second father to Amir, and indeed, Amir did not distinguish between his father and grandfather.  (*Id.*)

12.  While the family lived together in Paris, Gholam was outspoken in his opposition to Iran's revolutionary government and met with other expatriates in the family's apartment. (*Id.*)  Unlike the newly installed theocratic government, Gholam advocated secular democracy and favored cooperation with the United States.  (*Id.*)  Fearing reprisals, he hired a bodyguard, "Cyrus Tehrani."  (*Id.*)

13.  On February 17, 1984, Gholam Ali Oveissi was shot and killed while walking on Paris' crowded Rue du Passy.  (*Id.*)  Islamic Jihad immediately claimed responsibility.  (*Id.*)  No reason exists to dispute this claim, and nothing indicates the group acted under the

authority of an Iranian or other court judgment.

14.     Due to Iran's close financial and operational links to this group, the Court finds these

        acknowledged perpetrators were funded and controlled by defendant Iran through

        defendant MOIS.

15.     When he learned Gholam had been killed, Amir's father whisked the family to Morocco,

        where he informed young Amir of his grandfather's death.  (*Id.*)  The family remained in

        Morocco for approximately eighteen months, after which they returned to the United

        States, living in Maryland for a period before settling in Virginia.  (*Id.*)

16.     Amir testified that his grandfather's murder has defined who he is today.  (*Id.*)  He feels

        compelled to repeatedly view French news footage of the assassination's aftermath that

        depicts his grandfather's body lying in a pool of blood.  (*Id.*)  Though he finds it

        "torturous" at times to relive the event, he has endeavored to read every available book

        describing his grandfather's assassination and the Iranian revolution.  (*Id.*)  He has

        pursued graduate studies in foreign affairs and has researched his grandfather's death

        extensively, hoping to understand the political and ideological struggle that precipitated

        this brutal murder.  (*Id.*)

## CONCLUSIONS OF LAW

### *I.  Jurisdiction*

In the United States, the Foreign Sovereign Immunities Act, 28 U.S.C. sections 1330,

1602-1611, provides the sole basis on which a U.S. court may assert jurisdiction over a foreign

sovereign.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989).

As a general rule, foreign states are not subject to suit for money damages in U.S. courts.  28

U.S.C. § 1604 (2006).  Yet Congress has created specific exceptions to this broad grant of

immunity.  *See id.* § 1605.  One of these, the "state-sponsored terrorism" exception, allows a

plaintiff to seek money damages from a foreign state for personal injury or death caused by

> an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act[,] if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency . . . .

*Id.* § 1605(a)(7).

To qualify for the "state-sponsored terrorism" exception, a plaintiff must show that: (1)

the State Department had previously designated the foreign sovereign as a "state sponsor of

terrorism" or did so based on the event in question; (2) the victim or plaintiff was a U.S. national

when the event took place; and (3) "the foreign sovereign engaged in conduct that falls within the

ambit of the statute."  *Prevatt v. Islamic Republic of Iran*, 421 F. Supp. 2d 152, 158 (D.D.C. Mar.

28, 2006).

Here, all three requirements are satisfied.  First, defendant Iran has been designated a state

sponsor of terrorism continuously since January 19, 1984, one month prior to Gholam Ali

Oveissi's death.  *See* 31 C.F.R. § 596.201 (2001); *Flatow v. Islamic Republic of Iran*, 999 F.

Supp. 1, 9 (D.D.C. 1998) (Lamberth, J.).  Second, the term "U.S. national" embraces both United

States citizens and non-citizens who owe permanent allegiance to the United States.  8 U.S.C. §

1101(a)(22) (2006).  Plaintiff is a United States citizen and was when the event concerned herein

occurred, (Rep. Tr.); he was therefore a U.S. national.

Finally, defendant Iran's direction and sponsorship of Gholam Ali Oveissi's murder falls

squarely within the ambit of the statute.  *See* 28 U.S.C. §1605(a)(7), 1605(e)(1) (2006).  Because

8

defendant MOIS is a division of the Iranian state, the same analysis applies to its conduct.

*Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003), *cert. denied*, 542 U.S.

915 (2004) (if entity's core functions are governmental rather than commercial, "it is considered

the foreign state itself"); *Damarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 200-01

(D.D.C. 2003) (Bates, J.) [hereinafter *Damarell I*] (concluding that MOIS should be treated as

the state of Iran, itself, for liability purposes).  The FSIA lifts its definition of "extrajudicial

killing" from the Torture Victim Protections Act of 1991 ("TVPA"): "a deliberated killing not

authorized by a previous judgment pronounced by a regularly constituted court affording all the

judicial guarantees which are recognized as indispensable by civilized peoples."  28 U.S.C. §

1350 note (2006).  No evidence suggests *any* court pronounced judgment against Gholam Ali

Oveissi, and his shooting thus qualifies as an extra-judicial killing.

Personal jurisdiction exists over a non-immune foreign sovereign so long as service of

process has been effected under FSIA Section 1608.  *See Stern v. Islamic Republic of Iran*, 271

F. Supp. 2d 286, 298 (D.D.C. 2003) (Lamberth, J.).  In this case, plaintiff served Iran and MOIS

through diplomatic channels on May 30, 2006.  Accordingly, this Court has *in personam*

jurisdiction over both defendants.

## II. Legal Standard for FSIA Default Judgment

The Foreign Sovereign Immunities Act provides that "[n]o judgment by default shall be

entered by a court of the United States or of a state against a foreign state . . . unless the claimant

establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e);

*Roeder*, 333 F.3d at 232.  In default judgment cases, plaintiffs may present evidence in the form

of affidavits, and the court may accept plaintiffs' uncontroverted evidence as true.  *Bodoff*, 424 F.

Supp. 2d at 82; *Campuzano*, 281 F. Supp. 2d at 268.  Because defendants have neither objected

to nor even appeared to contest it, this Court will rely on plaintiff's uncontested evidence.

### III. Liability

Once a foreign state's immunity has been lifted under Section 1605 and jurisdiction is

found to be proper, Section 1606 provides that "the foreign state shall be liable in the same

manner and to the same extent as a private individual under like circumstances."  28 U.S.C. §

1606.  Section 1606 thus acts as a "pass-through" to substantive causes of action that may exist

in federal, state or international law.  *Dammarell v. Islamic Republic of Iran*, No. 01-2224, 2005

U.S. Dist. LEXIS 5343, at *27 (D.D.C. Mar. 29, 2005) (Bates, J.) [hereinafter *Dammarell II*].

*Cf. Cicippio-Puleo*, 353 F.3d at 1033 ("neither 28 U.S.C. § 1605(a)(7) nor the Flatow

Amendment, nor the two considered in tandem, creates a private of action against a foreign

government").  Plaintiff's complaint asserts three substantive causes of action - for wrongful

death, loss of solatium, and intentional infliction of emotional distress.  The Court will examine

the basis for each in turn.

### A. Wrongful Death

This Court is one of limited jurisdiction.  *See* U.S. Const. art. III, § 2; *Amerada Hess

Shipping Corp.*, 488 U.S. at 433 (quoting *Cary v. Curtis*, 44 U.S. 236, 245 (1845)) ("the subject-

matter jurisdiction of the lower federal courts is determined by Congress 'in the exact degrees

and character which to Congress may seem proper for the public good'").  As noted above, the

FSIA provides the *sole* basis on which a United States court may assert jurisdiction in a suit

against a foreign state.  *Amerada Hess Shipping Corp.*, 488 U.S. at 434-35.  Within this statute,

Congress has established certain, narrow exceptions to the longstanding legal principle of foreign

10

sovereign immunity.[4]  28 U.S.C. §§ 1604, 1605 (2006).

Plaintiff Amir Reza Oveissi invokes the Act's "state-sponsored terrorism" exception, which requires, *inter alia*, that "the victim or plaintiff was a U.S. national when the acts took place."  *Prevatt*, 421 F. Supp. 2d at 158; 28 U.S.C. § 1605(a)(7)(B)(ii) (2006) ("the court shall decline to hear a claim under this paragraph . . . if neither the claimant nor the victim was a national of the United States . . . when the act upon which the claim is based occurred").  Facially, then, the "state-sponsored terrorism" exception permits plaintiff - who, as a United States citizen, is also a U.S. national - to sue for injuries he suffered as a result of his grandfather's death, regardless of his grandfather's nationality.  Due to the unique nature of wrongful death claims, however, this particular cause of action is unavailable to him.

Wrongful death is a creature of statute unknown to the common law.  *E.g.*, *Sea-Land Servs. v. Gaudet*, 414 U.S. 573, 579 (1974) (quoting 2 F. Harper & F. James, *Law of Torts* § 24.1 (1956)) ("'all civil remedies for wrongful death derive from statute'"); *Aetna Life Ins. Co. v. Moses*, 287 U.S. 530, 539 (1933) ("[t]he right to recover for a wrongful death is the creature, not of the common law, but of a statute"); *Joy v. Bell Helicopter Textron*, 999 F.2d 549, 565 (D.C. Cir. 1993) ("At common law, there was no cause for action available to a surviving spouse or next of kin when an individual died as a result of a wrongful act.").  *See also Baker v. Bolton*, 179 Eng. Rep. 1033 (1808) ("[i]n a civil Court, the death of a human being could not be complained of as an injury").

---

[4] One of the Supreme Court's earliest pronouncements on this subject is found in *The Schooner Exchange v. M'Fadden*, 11 U.S. 116 (1812): "This full and absolute territorial jurisdiction being alike the attribute of every sovereign, and being incapable of conferring extraterritorial power, would not seem to contemplate foreign sovereigns nor their sovereign rights as its objects." *The Schooner Exchange*, 11 U.S. at 135.

The British Parliament enacted the first wrongful death statute, known as Lord

Campbell's Act, in 1846.  *See*, *e.g.*, *Gaudet*, 414 U.S. at 579, 579 n.6 (quoting the statute in full).

In relevant part, this statute provided

> that for the benefit of certain near relatives who had suffered pecuniary loss from the
> death of a person, the personal representatives should have a cause of action against the
> one who tortiously caused the death, provided that the deceased would have had a cause
> of action if he had been merely injured and not killed.

*Restatement (Second) of Torts* § 925 cmt. a (1971).  Damages were assessed based on the

decedent's probable contributions to the beneficiaries during his expected lifetime, and the

beneficiaries divided any recovery in proportion to their losses.  *Id.*  Nearly every U.S. state has

enacted its own wrongful death statute, and often, these statutes' provisions closely parallel those

of the original.[5]  *Id.*

As under Lord Campbell's Act, a cause of action for wrongful death under these modern

statutes is derivative in nature and is thus coterminous with the decedent's rights.  *Id.  See also*

*McInnis v. Provident Life & Accident Ins. Co.*, 21 F.3d 586, 589 (4th Cir. 1994) ("Conceptually,

the nature and amount of [a wrongful death] claim is the same as that which the decedent would

have had if he had not died.").  "Hence, if no action could have been brought by the deceased if

---

[5] *See*, *e.g.*, Colo. Rev. Stat. §§ 13-21-201, 13-21-202 (2006); Conn. Gen. Stat. § 52-555
(2007); D.C. Code § 16-2701 through 2703 (2007); Fla. Stat. Ann. §§ 768.16-768.25 (2007); 740
Ill. Comp. Stat. 180/1, 180/2 (2007); Ind. Code § 34-23-1-1 (2007); Ky. Rev. Stat. Ann. §
411.130 (Michie 2006); Md. Code. Ann., Cts. & Jud. Proc. §§ 3-901 through 3-904 (2007).
Mass. Gen. Laws. ch. 229, § 1, 2 (2007); Mo. Rev. Stat. §§ 537.080, 537.090 (2007); Miss.
Code. Ann. § 11-7-13 (2007); Neb. Rev. Stat. § 30-809, 30-810 (2007); N.J. Stat. Ann. §§
2A:31-1 through 2A:31-6 (2007); N.M. Stat. Ann. §§ 41-2-1, 41-2-3 (2007); N.Y. Est. Powers &
Trusts §§ 4-1.1, 5-4.1 through 5-4.6 (2007); N.C. Gen. Stat. § 28A-18-2 (2007); Ohio Rev. Code.
Ann. §§ 2125.01 through 2125.03 (2007); R.I. Gen. Laws. §§ 10-7-1 through 10-7-3 (2007); S.C.
Code Ann. §§ 15-51-10 through 15-51-40 (2006); S.D. Codified Laws §§ 21-5-1 through 21-5-8
(2007); Va. Code Ann. §§ 8.01-50 through 8.01-53 (2007); W. Va. Code §§ 55-7-5, 55-7-6
(2007).

still alive, no right of action exists." *Restatement (Second) of Torts* § 925 cmt. a (1971).  Here, then, plaintiff Amir Reza Oveissi has a right of action only if his grandfather, had he lived, could have brought suit for the injuries he sustained.

Though plaintiff is a U.S. citizen, (Pl.'s Am. Compl. 1), his recovery must turn on *the decedent's* nationality.  Gholam Ali Oveissi was born a citizen of Iran.  (Rep. Tr.)  Plaintiff, his grandson, testified that Gholam visited the United States at least once for military training and returned briefly in 1979.  (*Id.*)  Yet nothing indicates he ever became a United States citizen.  Furthermore, within months of his arrival here in 1979, he left for Paris, France, where he resided until his untimely death in February 1984.  (*Id.*)  Because he spent only two brief, intermediate periods of his life in this country, the Court concludes Gholam Ali Oveissi did not owe permanent allegiance to the United States.   Thus, he was not a U.S. national.  *See* 8 U.S.C. § 1101(a)(22) (2006).  As both plaintiff and victim, he could not recover against Iran and MOIS under the FSIA's "state-sponsored terrorism" exception, which expressly requires that either the plaintiff or victim, or both, be a U.S. national.  28 U.S.C. § 1605(a)(7)(A)(ii) (2006).

Article III of the United States Constitution provides that federal courts' judicial power shall extend to, *inter alia*, controversies "between a State, or the Citizens thereof, and foreign States, Citizens, or Subjects."  U.S. Const. art. III § 2.  This provision, known as alienage jurisdiction, conspicuously excludes any provision for suits *between* foreign states, citizens, or subjects.  *See id.*  Indeed, "[s]uits solely between aliens are outside the constitutional grant of judicial power."  *Sadat v. Mertes*, 615 F.2d 1176, 1183 (7th Cir. 1980).  *See also Kramer v. Caribbean Mills, Inc.*, 394 U.S. 823, 825 n.2 (1969) (district court would lack jurisdiction in suit between alien corporations); *Montalet v. Murray*, 8 U.S. 46, 47 (1807) ("The Court was

unanimously of the opinion that the courts of the United States have no jurisdiction of cases between aliens.").

Yet Article III also confers jurisdiction over cases "arising under . . . the Laws of the United States." U.S. Const. art. III § 2. As the Supreme Court has recognized, because Congress has "enact[ed] a statute [the FSIA] comprehensively regulating the amenability of foreign nations to suit in the United States," actions against foreign sovereigns "arise[] under federal law, for purposes of Art. III. jurisdiction." *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 493, 494 (1983). Though cases solely between foreign nationals "are outside the constitutional grant of power, *Sadat*, 615 F.2d at 1183, the Court has held that when it enacted the FSIA, Congress intended to permit suits between foreign nationals and foreign *states* in U.S. courts under limited circumstances. *Verlinden B.V.*, 461 U.S. at 490.

> Congress was aware of the concern that "our courts [might be] turned into small 'international courts of claims[,]' . . . open . . . to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world." As the language of the statute reveals, Congress protected against this danger not by restricting the class of potential plaintiffs, but rather by enacting substantive provisions *requiring some form of substantial contact with the United States*.

*Id.* (citations omitted) (emphasis added). Here, however, not only would a suit brought by Gholam Ali Oveissi against Iran and MOIS violate the "state-sponsored terrorism" exception's explicit terms, but it would also involve *virtually no contact whatever* with the United States. Rather, it would ask a United States court to apply foreign law[6] in a suit against a foreign

---

[6] In previous FSIA cases, this Court and others in this district have looked to the decedent's state of domicile for governing law in wrongful death claims. *See, e.g., Heiser*, 466 F. Supp. 2d at 271-356; *Dammarell v. Islamic Republic of Iran*, No. 01-2224, 2005 U.S. Dist. LEXIS 5343, at *67-68 (D.D.C. Mar. 29, 2005) (Bates, J.) [hereinafter *Dammarell II*]. *Contra Restatement (Second) of Conflict of Laws* § 175 (1971) (law of place where injury occurred typically governs wrongful death claims). As Judge Bates explained in *Damarell II*, in

sovereign concerning injury, abroad, to a foreign national never domiciled in this country.

Hence, it would lack the substantial U.S. connection that Congress deemed necessary to ensure

the FSIA did not transform United States courts into "'international courts of claims.'" *See*

*Verlinden B.V.*, 461 U.S. at 490.

Thus, both the "state-sponsored terrorism" exception's explicit requirements and the

Foreign Sovereign Immunities Act's intentionally narrow scope would have barred any action by

Gholam Ali Oveissi, had he lived, against defendants Iran and MOIS.  Because "no action could

have been brought by the deceased if still alive, no right of action exists," and the Court lacks

jurisdiction to entertain plaintiff's wrongful death claim.[7]  *Restatement (Second) of Torts* § 925

cmt. a (1971).

### B. Loss of Solatium

Count II of plaintiff's amended complaint alleges a cause of action for loss of solatium.

(Pl.'s Am. Compl. 4-5.)  Solatium is defined as compensation for a plaintiff's "hurt feelings or

grief, as distinguished from damages for physical injury."  Black's Law Dictionary 1397 (7th ed.

---

"wrongful death actions arising out of mass disasters," the decedent's place of domicile has an important "'interest in ensuring that its residents are fully and adequately compensated for tortious harm.'"  *Id.* at *59-60 (quoting *Pescatore v. PAN AM*, 97 F.3d 1, 13 (2d Cir. 1996)). Though the present action arises from a single-victim extrajudicial murder rather than a mass-disaster, the Court finds that acts of state-sponsored terrorism are sufficiently analogous to generate a similarly weighty governmental interest.  Because Gholam Ali Oveissi had lived in Paris, France for approximately five years when his life ended there in February 1984, he would likely be deemed a domiciliary of France.  *See Restatement (Second) Conflict of Laws* §§ 15, 16, 18 (1971) (domicile of choice acquired by coincidence of legal capacity, physical presence, and intent to remain "for the time at least").  French wrongful death law, if any exists, would therefore apply to plaintiff's claim.

[7] The Court takes no position on the merits of plaintiff's claim, nor on whether he could successfully raise this claim in some other forum.

1999).  "A claim for solatium refers to the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort."  *Damarell I*, 281 F. Supp. 2d at 196.

In Public Law 104-208 of 1996 ("the Flatow Amendment"), Congress expressly granted plaintiffs the right to seek money damages, including solatium, against foreign states' officials, employees, and agents in their personal capacities for conduct within the "state-sponsored terrorism" exception.  Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, Div. A, Title I, § 101(c), 110 Stat. 3009-172 (codified at 28 U.S.C. § 1605 note).  According to the Court of Appeals, however, the Flatow Amendment did not create a substantive cause of action against foreign states.  *Cicippio-Puleo*, 353 F.3d at 1033 ("neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private of action against a foreign government").  *Cf. Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1129 (D.C. Cir. 2004) ("§ 1605(a)(7) is solely a jurisdictional provision  . . . [and] plaintiff must go beyond jurisdiction and provide proof satisfying a substantive cause of action").

Thus, as other courts in this district have held, "[s]olatium [] is not an independent cause of action, but rather [] a form of damages."  *Reed v. Islamic Republic of Iran*, 439 F. Supp. 2d 53, 67-68 (D.D.C. 2006) (Urbina, J.) (citing *Salazar*, 370 F. Supp. 2d at 115).  A plaintiff may obtain solatium damages only by alleging an independent statutory cause of action that so provides, or in conjunction with a common law claim.  Typically, for example, solatium damages are available to intentional infliction of emotional distress ("IIED") claimants.  *See, e.g., Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 269 n.8 (D.D.C. 2002); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002); *Wagner v. Islamic Republic of Iran*, 172

16

F. Supp. 2d 128, 135 n.11 (D.D.C. 2001).  Hence, plaintiff's solatium claim must be considered, if at all, in the Court's calculation of damages for any substantive cause of action on which it finds defendants Iran and MOIS liable.

### C. Intentional Infliction of Emotional Distress

#### 1. Choice of Laws Analysis

Under the District of Columbia's "constructive blending" of the "governmental interests" and "most significant relationship" analyses, the Court must "evaluate the [underlying] governmental policies . . . and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review." *Hercules & Co. v. Shama Restaurant Corp.*, 566 A.2d 31, 41 (D.C. 1989).  Generally, application of the governmental interest test points to the law of the plaintiff's domicile at the time of the acts at issue as having the greatest interest in providing redress to its citizens.  *See Dammarell II*, 2005 U.S. Dist. LEXIS 5343, at *59-70.

Hence, the Court must determine plaintiff's domicile in February 1984.  Plaintiff Amir Reza Oveissi was born on May 30, 1979.  (Rep. Tr.)  When Gholam Ali Oveissi was shot, Amir was a minor and resided with his grandfather and parents in Paris, France.  (*Id.*)  "Since most minors are legally incapable of forming the requisite intent to establish a domicile, their domicile is determined by that of their parents." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989) (citing *Yarbrough v. Yarbrough*, 290 U.S. 202, 211 (1933)).  *See also Restatement (Second) of Conflict of Laws* § 22 (1971).  More generally, however, "[o]ne acquires a 'domicile of origin' at birth," and because residence does not equate to domicile, one retains one's domicile of origin until one supplants it with a "domicile of choice," established through physical presence

in another place with the intent to remain there. *Holyfield*, 490 U.S. at 48 (citing *In re Estate of Jones*, 182 N.W. 227, 228 (Iowa 1921); *Perri v. Kisselbach*, 167 A.2d 377, 379 (N.J. 1961); *In re Estate of Moore*, 415 P.2d 653, 656 (Wash. 1966)).

Because plaintiff was a minor in 1984, his legal domicile was presumably that of his parents. *See Yarbrough*, 290 U.S. at 211. Amir's parents fled their home in Iran in 1979, traveling first to the United States and then to France. (Rep. Tr.) They remained in Paris until just after Gholam's murder, at which time they fled to Morocco. (*Id.*) After approximately eighteen months in Morocco, the family returned to the United States, eventually settling in Virginia. (*Id.*)

On these facts, it appears plaintiff's parents were domiciled in Iran until at least 1979. Though they established physical presence in California thereafter, nothing indicates they intended to remain more permanently. By contrast, the family spent nearly five years in Paris and established a home there with Amir's grandfather. (*Id.*) Amir and his older brother attended school, and the family attempted to resume "a normal life." (*Id.*) Hence, the Court concludes Amir's parents had established a domicile of choice in France at the time of Gholam's murder and that Amir was thus a French domiciliary.

But as many courts in this District have observed, the United States has a "unique interest" in having its domestic law apply when its citizens are injured by state-sponsored terrorist acts. *See Dammarell II*, 2005 U.S. Dist. LEXIS 5343, at *63. Indeed, this consideration "elevates the interests of the United States to nearly [their] highest point." *Id.* Born in California, Amir Reza Oveissi is and was a United States citizen. (Rep. Tr.) As such, the United States' "paramount interest in guaranteeing redress to its citizens" militates against the

application of French law.  *Dammarell II*, 2005 U.S. Dist. LEXIS 5343, at *63.

In 1984, plaintiff had resided in only one U.S. state: California.  (Rep. Tr.)  This period of residence, though brief, gave rise to his status as a United States citizen - the status which, as discussed above, confers his right to bring this suit under section 1605(a)(7).  Therefore, the Court concludes it is appropriate to apply California law to plaintiff's claim for intentional infliction of emotional distress.

*2. Vicarious Liability*

In California, civil conspiracy consists of the "formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design." *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994) (internal quotations and citations omitted).  This legal doctrine "imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration." *Id.*  Because coconspirators "effectively adopt[] as [their] own the torts of other coconspirators within the ambit of the conspiracy . . . [they] incur[] tort liability co-equal with the immediate tortfeasors." *Id.*

Here, defendant Iran, through defendant MOIS, provided support to Hezbollah in Southern Lebanon in the early 1980s and employed its members to conduct terrorist activities outside the Middle East.  Under the cover name "Islamic Jihad,"and at the direction of Iran and MOIS, Hezbollah militants assassinated expatriate Iranian dissidents in Europe who opposed the revolutionary regime's ideology.  It is undisputed that Gholam Ali Oveissi was one victim of this orchestrated campaign.  Because Islamic Jihad carried out his murder under defendants' orders and sponsorship, Iran and MOIS share in the actual perpetrators' liability.

*3. Plaintiff's Standing*

The California Supreme Court describes the elements of intentional infliction of emotional distress ("IIED") as follows: "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Cervantez v. J.C. Penney Co.*, 595 P.2d 975, 983 (Cal. 1979).

Before reaching the merits of plaintiff's claim under this rubric, however, the Court must ensure he has standing to assert it. A plaintiff has standing to bring an IIED claim as a direct victim, for conduct directed at himself, or as a third party victim, for conduct directed at another in his presence. *Christensen v. Superior Ct.*, 820 P.2d 181, 203-04 (Cal. 1992). When a defendant acts with reckless disregard of a high probability of causing a third party severe emotional distress, however, the third-party victim's physical presence is unnecessary. *Id.*

As this Court has frequently observed, "'a terrorist attack - by its nature - is directed not only at the victims but also at the victims' families.'" *Heiser*, 466 F. Supp. 2d at 305 (quoting *Salazar*, 370 F. Supp. 2d at 115 n.12). For practical reasons, even in terrorism cases, courts have stopped short of treating certain family members as direct victims. *See Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 334-35 (D.C. Cir. 2003) (nieces and nephews not direct victims). But they have found that some family members need not prove physical presence in order to state cognizable third-party IIED claims. *See, e.g., Heiser*, 466 F. Supp. 2d at 305. Specifically, where state law does not provide a clear rule of decision, this Court has looked to *Restatement (Second) of Torts* section 46, comment l, which observes that typically a victim's "near relatives"

may recover under a third-party theory.  *Id.*

In *Heiser*, this Court found that California law circumscribed this class of plaintiffs:

Under California law, standing to bring a claim against a defendant resulting from the death of an individual is conferred on those who are entitled to inherit property of the deceased under the provisions of the California probate code.  *See* Cal. Civ. Proc. Code § 377.60; Cal. Prob. Code § 6402.

*Heiser*, 466 F. Supp. 2d at 309.  When a decedent dies intestate, the California Probate Code directs that his estate shall pass first to his issue, or lineal descendants, if any survive him.  Cal. Prob. Code §§ 50, 6402(a) (2007).  These issue shall take "equally if they are all of the same degree of kinship to the decedent, but if of unequal degree those of more remote degree take in the manner provided in section 240."  *Id.* § 6402.  Section 240, in turn, directs the probate court to distribute the decedent's estate in equal shares among members of the nearest living generation of descendants, with shares of any deceased members passing to the next generation by representation.  *Id.* § 240.  In short, if a decedent leaves a surviving child or children, the children inherit equal shares of his estate, but a surviving grandchild may take only if his parent is deceased.

Here, plaintiff Amir Reza Oveissi, as Gholam Ali Oveissi's lineal descendant, qualifies as a potential beneficiary under section 6402.  But because his father remains alive, (Rep. Tr.), under the distribution scheme established in section 240, he could not ultimately inherit from his grandfather.  Therefore, because he would not be entitled to inherit Gholam's property under the California probate code, Amir lacks standing to bring an IIED claim based on Gholam's death.

This result squares with the common law approach.  In a previous Foreign Sovereign Immunities Act case, this Court and the Court of Appeals applied a modified version of

*Restatement (Second) of Torts* section 46(2)(a).  *Bettis*, 315 F.3d at 335; *Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 35-36 (D.D.C. 2001).  That section provides that "[w]here [] conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress [] to *a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm.*" *Restatement (Second) of Torts* § 46(2)(a) (1965) (emphasis added).  This Court held that because the intent to distress a victim's "immediate family" is "implicit in the nature of" terrorism, such persons may recover without proving the presence element.  *Jenco*, 154 F. Supp. 2d at 36.  Deferring to "the traditional understanding," the Court then defined "immediate family" as including a decedent's "spouse, parents, siblings, and children."  *Jenco*, 154 F. Supp. at 36 n.8 (citing Dan B. Dobbs, *The Law of Torts*, § 310 (2000)).  As Gholam's grandson, plaintiff would still lack standing under this common law approach.

Finally, though plaintiff and his grandfather enjoyed an exceptionally close relationship, as this Court observed in *Jenco*, "the Court must [] bear in mind the realities of tort law and the necessity of limiting recovery to a definable scope of individuals."  154 F. Supp. 2d at 36-37.  In *Bettis*, the Court of Appeals noted that some courts had permitted more distant relatives to recover for negligent infliction of emotional distress based on indicia of emotional closeness, such as co-residence or guardianship.  315 F.3d at 337.  But as that court recognized: "It is not within our authority to extend liability for *intentional* infliction of emotional distress beyond what has been allowed by the common law or authorized by the statute."  *Id.* (emphasis added).  State-sponsored terrorism, by its nature, creates a shock wave of emotional trauma that affects a direct victim's family circle, close friends, and even acquaintances.  *See Heiser*, 466 F. Supp. 2d

at 305.  Federal courts are ill-qualified to pick and choose among these potential third-party

claimants, subjectively assessing their relationships to those directly injured and allowing

recovery to those deemed sufficiently "close" to the victims.  *See Bettis*, 315 F.3d at 338.  If

third-party IIED claims are to be properly justiciable, an objective line must be drawn

somewhere, and under both the California Probate Code and the common law, as the decedent's

grandson, plaintiff falls outside it.

Because he lacks standing, plaintiff's IIED claim fails.[8]

## CONCLUSION

Plaintiff's effort to hold Iran accountable for its sponsorship of terrorist crimes reflects

great steadfastness of character, and the Court commends his courage in pursuing this litigation.

The Court has found defendants Iran and MOIS culpable in the brutal murder of plaintiff's

grandfather, Gholam Ali Oveissi.  Sadly, however, damages are unavailable to plaintiff under the

laws of the United States.

A judgment consistent with these findings shall issue this date.


Signed by Royce C. Lamberth, United States District Judge, August 3, 2007.

---

[8] Again, the Court emphasizes that it expresses no opinion on the merits of plaintiff's claim.  Because the threshold standing requirement is unfulfilled, the Court need not - and indeed, should not - evaluate whether plaintiff has offered adequate evidence as to each element of IIED.