## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMIR REZA OVEISSI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 03-cv-1197 (RCL) |
| | ) | |
| THE ISLAMIC REPUBLIC OF IRAN, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

## I.      INTRODUCTION

This case arises out of the assassination of Gholam Ali Oveissi, a military leader in pre-

revolution Iran, who was gunned down on a Paris street in February 1984 by the agents of the

Islamic Republic of Iran ("Iran") and its intelligence service, the Iranian Ministry of Information

and Security ("MOIS").  Plaintiff Amir Reza Oveissi, grandson to the senior Oveissi, brought

suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*

(2010), alleging that defendants' involvement in the murder subjected them to suit under the

FSIA's "state-sponsored terrorism" exception, which at the time of the original suit was codified

at 28 U.S.C. § 1605(a)(7).[1]  By memorandum opinion dated August 3, 2007, the Court dismissed

plaintiff's suit.  *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268 (D.D.C. 2007) ("*Oveissi*

---

[1] Subsequent to plaintiff's bringing this suit, Congress passed the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"), which, among other things, eliminated the terrorism exception under which this case was brought by repealing 28 U.S.C. § 1605(a)(7), and replaced it with a new exception codified at 28 U.S.C. § 1605A.  Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008).  The Act permits parties in cases that were pending under § 1605(a)(7) to refile those claims under § 1605A.  2008 NDAA, Jan. 28, 2008, § 1083(c)(2)(A).  Here, however, plaintiff has not attempted to refile, and thus the Court retains jurisdiction while the case proceeds under former § 1605(a)(7).  *See Simon v. Republic of Iraq*, 529 F.3d 1187, 1190 (D.C. Cir. 2008), *rev'd on other grounds sub nom Republic of Iraq v. Beaty*, 129 S. Ct. 2183 (2009) ("[C]ourts retain jurisdiction pursuant to [former] § 1605(a)(7) over cases that were pending under that section when Congress enacted the NDAA.").

*I*"). Though finding "defendants Iran and MOIS culpable in the brutal murder of plaintiff's grandfather, Gholam Ali Oveissi," the Court concluded that plaintiff could not state a legal claim for relief under applicable U.S. law. *Id*. at 284. On appeal, the Court of Appeals for the District of Columbia Circuit reversed, holding that the law of France—where Gholam Ali Oveissi resided when he was murdered—rather than the law of California—where plaintiff was born and previously resided—should govern liability. *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 841 (D.C. Cir. 2009) ("*Oveissi II*"). On remand, the Court now finds defendants subject to suit and liable under the FSIA and relevant French law, and orders that an evidentiary hearing be scheduled to permit plaintiff an opportunity to present evidence concerning damages.

## II. PROCEDURAL HISTORY

*Oveissi I* catalogues the history of this action prior to that decision, so the Court only briefly repeats it here. Plaintiff filed his original Complaint seeking compensation for pecuniary losses, solatium, and punitive damages on June 2, 2003. *Oveissi I*, 498 F. Supp. 2d at 271. Following numerous failed attempts to serve defendants, and several intervening decisions of legal importance by the D.C. Circuit, plaintiff filed the Amended Complaint on December 31, 2005, which remains operative and states claims for wrongful death and intentional infliction of emotional distress, and he executed service through diplomatic channels on May 30, 2006. *Id*. at 271–72. Defendants failed to appear for any part of these proceedings, and the Clerk of Court entered default on April 9, 2007. *Id*. at 272.

### A. The Original *Oveissi I* Opinion

Though the clerk entered default in *Oveissi I*, the FSIA requires that courts enter final judgment against foreign states in default only once a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e). In satisfaction of this

obligation, the Court made several findings of fact[2] and reached numerous conclusions of law in *Oveissi I*. Of particular importance, the Court reached the following legal conclusions:

First, the Court determined that plaintiff could not bring a claim for wrongful death for the murder of his grandfather. As the Court explained: "Wrongful death is a creature of statute unknown to the common law," and modern U.S. states' wrongful death statutes are generally derived from the statute enacted by the British Parliament, known as Lord Campbell's Act. *Oveissi I*, 498 F. Supp. 2d at 277. That Act, and the modern U.S. counterparts, make the cause of action for wrongful death "derivative in nature and thus coterminous with the decedent's rights." *Id*. Thus, Amir Reza Oveissi has a right of action under U.S. law "only if his grandfather, had he lived, could have brought suit for the injuries he sustained." *Id*. at 277–78. The decedent, however, was not a U.S. national, and thus would have been incapable of satisfying prerequisite to the FSIA's state-sponsored terrorism exception requiring that at least one of the plaintiff or victim be a U.S. national. 28 U.S.C. § 1605(a)(7)(A)(ii).[3] The Court therefore concluded that it could not entertain plaintiff's cause of action for wrongful death. *Oveissi I*, 498 F. Supp. 2d at 279.

Second, the Court determined that California law should apply to plaintiff's claim for intentional infliction of emotional distress. By applying the District of Columbia's "'constructive blending' of the 'governmental interests' and 'most significant relationship' analyses," the Court found that this test pointed to application of French law, as Amir was a domiciliary of France at the time of his grandfather's murder. *Id*. at 280–81. However, the

---

[2] The Court discusses the findings of fact in *Oveissi I* in greater length in Section III, *infra*.

[3] As discussed above, plaintiff chose to proceed under former 28 U.S.C. § 1605(a)(7), rather than to refile suit under § 1605A following passage of the NDAA. For purposes of economy, the Court will simply refer to former § 1605(a)(7) throughout the rest of this opinion, without needless and repeated references indicating that the section has been repealed. The Court also notes that much of the analysis that follows is equally applicable to suits brought under § 1605A, as the new exception's language regularly tracks that of former § 1605(a)(7).

Court then held that the United States' "'unique interest' in having its domestic law apply when its citizens are injured by state-sponsored terrorist acts"—an interest that "elevates the interests of the United States to nearly their highest point"—overwhelmed these other factors in the choice-of-law determination, thus requiring application of U.S. law. *Id.* at 281 (citing *Dammarell v. Islamic Republic of Iran*, No. 01-2224, 2005 U.S. Dist. LEXIS 5343, at *63 (D.D.C. Mar. 29, 2005)). The Court then concluded that California law should apply, as it was the only state in which Amir had resided prior to his grandfather's murder. *Id.*

Finally, the Court held that under California law plaintiff lacked standing to bring a claim for intentional infliction of emotional distress. As the Court explained: "Under California law, standing to bring a claim against a defendant resulting from the death of an individual is conferred on those who are entitled to inherit property of the deceased under the provisions of the California probate code." *Id.* at 282 (quoting *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 309 (D.D.C. 2006) (Lamberth, J.)). The California probate code, however, did not legally entitle Amir Reza Oveissi to inherit his grandfather's estate. *Id.* The Court therefore held that the claim was barred on standing grounds, and dismissed the Amended Complaint. *Id.*

### B. The Appeal

On appeal, plaintiff Amir Reza Oveissi challenged each of the Court's legal conclusions described above. The Court of Appeals, however, focused on a single issue: whether it was proper for this Court to apply California, rather than French, law. *Oveissi II*, 573 F.3d at 841.

The Court of Appeals began its discussion by examining whether courts in FSIA cases should apply the choice-of-law principles of the forum in which they sit or should construct a set of federal common law principles. Concurring with the Second Circuit, it adopted the former approach, holding that "applying the forum state's choice-of-law principles . . . better effectuates

Congress' intent that foreign states be liable in the same manner and to the same extent as private individuals in FSIA actions." *Id*. (internal quotations omitted). The Court of Appeals thus applied the District of Columbia's blended approach to choice-of-law, and concluded that the relevant choice-of-law factors "overwhelmingly point in the direction of France." *Id*. at 842.

Turning to this Court's holding that the United States' unique interest in providing redress for citizens injured by state-sponsored terrorism should trump France's otherwise-dominant interests, the Court of Appeals held that this principle was inapplicable given the circumstances of this case. Specifically, while acknowledging that U.S. interests may be paramount in cases where, for example, the terrorist attack was "directed against the security of the state" or was motivated by the nationality of the victims, *id*. at 843, the Court of Appeals pointed to the fact that Gholam Ali Oveissi was an Iranian national and French domiciliary, as well as evidence indicating that the assassination was one in a series "intended to . . . deter French intervention in Lebanon," *id*. (citing *Oveissi I*, 498 F. Supp. 2d at 273), to distinguish this case. Here, the Court of Appeals explained, "if any country was the object of the attack it was France." *Id*. The Court thus held that French law should be applied, and remanded the case to this Court "to evaluate the plaintiff's claims under French law." *Id*. at 844.

### C.     Remand

Following remand, the Court ordered and received briefings on a number of issues. Having now considered the Court of Appeals' guidance in *Oveissi II*, as well as the supplemental briefings, the Court makes the following findings of fact and conclusions of law.

## III.     FINDINGS OF FACT

The Court clerk entered default judgment on April 9, 2007. Before entry of final judgment, however, the Court must be satisfied that plaintiff has "establishe[d] his claim or right

to relief by evidence that is satisfactory to the court," 28 U.S.C. § 1608(e), thus obligating the

Court "to inquire further before entering judgment against Iran and MOIS." *Oveissi I*, 498 F.

Supp. 2d at 272.

Courts may look to many sources in satisfaction of this obligation. As an initial matter,

the Court can rely upon "'uncontroverted factual allegations, which are supported by . . .

documentary and affidavit evidence.'" *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52,

59 (D.D.C. 2010) (Lamberth, J.) (alteration in original; quoting *Int'l Rd. Fed'n v. Embassy of the

Democratic Republic of the Congo*, 131 F. Supp. 2d 248, 252 n.4 (D.D.C. 2001)). In addition,

the Court may "'take judicial notice of related proceedings and records in cases before the same

court.'" *Valore*, 700 F. Supp. 2d at 59 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp.

2d 43, 50–51 (D.D.C. 2009)). Finally, the Court may of course evaluate and rely upon the

documentary and testimonial evidence presented throughout the proceeding before it.

The Amended Complaint in this case alleges, *inter alia*, that "agents of [Iran] and the

MOIS shot and killed" plaintiff's grandfather, Gholam Ali Oveissi, Amended Complaint at ¶ 5,

Dec. 31, 2005 [19], , that Gholam "was the victim of state sponsored terrorism by virtue of his

extrajudicial killing," *id*. at ¶ 10, and that plaintiff Amir Reza Oveissi has suffered financial and

emotional injuries as a result of his grandfather's murder. *Id*. at ¶ 8.

In support of these allegations, plaintiff Oveissi, as well as a man known as "Cyrus

Tehrani," testified at a bench trial held on February 2, 2007. *Oveissi I*, 498 F. Supp. 2d at 272.

In addition, the Court received into evidence the video deposition of Dr. Reuven Paz, an

international terrorism expert. *Id*. There being no intervening events that would raise any

concerns regarding the validity of the Court's findings of fact in *Oveissi I*, the Court hereby

adopts its previous factual determinations, in their entirety.

Critically, the findings of fact in *Oveissi I* include the following: First, plaintiff Amir

Reza Oveissi was born in the United States, is thus a United States citizen, and is the paternal

grandson of decedent Gholam Ali Oveissi. *Id*. at 272–73. Second, "Defendant Iran 'is a foreign

state and has been designated as a state sponsor of terrorism pursuant to section 6(j), of the

Export Administration Act of 1979, 50 U.S.C. § 1405(j) continuously since January 19, 1984.'"

*Id*. at 272 (quoting *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 20 (D.D.C. 2002)

(Lamberth, J.)). Third, Iran "has sponsored and orchestrated terrorist activities" through

defendant MOIS, and Iranian agents founded a political organization known as Hezbollah, or

"Party of God," which, under the direction of Iran and MOIS, engaged in terrorist activities

outside of the Middle East using the *nom-de-guerre* "Islamic Jihad."[4] *Id*. at 272-73. Fourth,

Iran, through MOIS, provided logistical support and training that were "crucial" to Hezbollah's

ability to carry out assassinations, including those undertaken as "Islamic Jihad." *Id*. at 273.

Finally, Islamic Jihad was responsible for the murder of Gholam Ali Oveissi in Paris, France,

and the agents carrying out the assassination "were funded and controlled by defendant Iran

through defendant MOIS." *Id*.

## IV.    CONCLUSIONS OF LAW

Based on the findings of fact made in *Oveissi I* and incorporated here, the Court makes

the following conclusions of law:

### A.    Subject Matter Jurisdiction

The FSIA and related statutes set forth several requirements that must be satisfied for the

Court to have jurisdiction over this matter and proceed with a suit against a foreign state.

Plaintiff here has satisfied these prerequisites.

---

[4] As the Court explained in *Oveissi I*, Hezbollah is synonymous with "Hizbollah," which is merely a "variant transliteration[] of the same name." *Oveissi I*, 498 F. Supp. 2d at 273 n.3.

### 1. Original Jurisdiction

For the Court to entertain a suit against a foreign state under the state-sponsored terrorism exception to the FSIA, plaintiff must demonstrate that the alleged conduct falls within the ambit of the Act's statutory grant of jurisdiction. Specifically, the state-sponsored terrorism exception provides a plaintiff may not maintain a suit under the FSIA unless (1) "money damages are sought," (2) "against a foreign state" for (3) "personal injury or death" that (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . for such an act." 28 U.S.C. § 1605(a)(7).

Here these requisite conditions to exercise jurisdiction are easily satisfied. First, plaintiff's suit seeks only monetary compensation. Amended Complaint at ¶¶ 10-16. Second, defendant Iran is undoubtedly a foreign state. With respect to defendant MOIS, the FSIA defines foreign state to include "a political subdivision . . . or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Under settled D.C. Circuit precedent, "an entity that is an integral part of a foreign state's political structure" is considered a political subdivision and thus treated "as the foreign state itself." *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 300 (D.C. Cir. 2005) (internal quotations omitted). Applying this test, MOIS constitutes a foreign state for FSIA liability purposes. *Oveissi I*, 498 F. Supp. 2d at 275 (citing *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 200–01 (D.D.C. 2003)). Third, the evidence demonstrates that Gholam Ali Oveissi was murdered in Paris on February 17, 1984. *Id*. at 274. Fourth, the evidence has established, *inter alia*, that Iran was deeply involved in the creation of Hezbollah, that MOIS directed Hezbollah activities undertaken as Islamic Jihad, that defendants provided logistical support and training to agents of Hezbollah and thus Islamic Jihad, and that Islamic Jihad has claimed responsibility for the murder of the senior Oveissi. *Oveissi I*, 498 F.

Supp. at 273–74.  Taken together, this evidence satisfies the FSIA's causation requirement, which is met by showing that "there is 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'"  *Valore*, 700 F. Supp. 2d at 66 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)).  Finally, there is no evidence in the record that the shooting of Gholam Ali Oveissi was judicially sanctioned.  Thus, his murder constitutes an extrajudicial killing under the relevant statute.  *See* Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note (defining extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples").  Because the evidence satisfies these prerequisites, the Court may entertain plaintiff's claims.[5]

### 2.    Waiver of Immunity

In addition to outlining jurisdictional requirements, the FSIA sets forth the limited circumstances in which a foreign state waives sovereign immunity and becomes liable to suit under the Act.  As the Court of Appeals explained:  "[The state-sponsored terrorism] exception applies only if three additional criteria are also satisfied:  the foreign state was designated a 'state sponsor of terrorism' at the time the act occurred; the foreign state was given a reasonable opportunity to arbitrate a claim regarding an act that occurred within the state's borders; and the claimant or victim was a national of the United States."  *Oveissi II*, 573 F.3d at 839 (citing 28 U.S.C. § 1605(a)(7)(A)–(B)).

---

[5] Plaintiff served the Amended Complaint on defendants through diplomatic channels on May 30, 2006, as authorized under FSIA, 28 U.S.C. § 1608(a)(4).  The Court thus has personal jurisdiction over the defendants.  *See Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 296 (D.D.C. 2003) (Lamberth, J.) (holding that personal jurisdiction exists over non-immune foreign state where service is effected under §1608).

Here, circumstances warrant the waiver of defendants' traditional immunity. First, as discussed above, Iran has been continuously designated a state sponsor of terrorism pursuant to the Export Administration Act of 1979 since January 19, 1984—prior to the murder of Gholam Ali Oveissi. *See supra* Section III. Second, because the senior Oveissi was killed in Paris, France, rather than in Iran, the FSIA's requirement that Iran be given an opportunity to arbitrate this dispute is inapplicable here. Third, the Court in *Oveissi I* found that plaintiff was born in the United States, and thus is a United States citizen in satisfaction of the statutory requirements for waiver of sovereign immunity. 498 F. Supp. 2d at 272. Accordingly, defendants' immunity is waived for purposes of being held accountable for the assassination of Gholam Ali Oveissi.

### B.      Liability

Though this Court has determined that defendants Iran and MOIS are culpable in the murder of Gholam Ali Oveissi, and thus subject to suit under the state-sponsored terrorism exception to the FSIA embodied in former 28 U.S.C. § 1605(a)(7), the question still remains whether defendants may be held *legally* liable for this crime. As the Court explained in *Oveissi I*, the FSIA does not itself provide an independent cause of action,[6] but rather "acts as a 'pass-through' to substantive causes of action that may exist in federal, state or international law." 498 F. Supp. 2d at 276 (quoting *Dammarell*, 2005 U.S. Dist. LEXIS 5343 at *27). In *Oveissi I*, the Court determined that plaintiff had articulated two separate causes of action in the Amended Complaint—for wrongful death and intentional infliction of emotional distress—and subsequently determined that each claim was legally insufficient under California law. *Id.* at 276–83. On appeal, the Court of Appeals determined that this Court erred in applying California

---

[6] Though this statement concerning former 28 U.S.C. § 1605(a)(7), which controls this case, is accurate, § 1605A—which supplanted the former provision as the "state-sponsored terrorism" exception—does indeed "provide[] an independent federal cause of action." *Valore*, 700 F. Supp. 2d at 58 (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. supp. 2d 31, 58-61 (D.D.C. 2009)). That independent cause of action is unavailable to plaintiff here, as he is proceeding under § 1605(a)(7). *See supra* note 1.

law rather than the law of France, *Oveissi II*, 573 F.3d at 841-43, and instructed this Court to re-evaluate plaintiff's FSIA claim under French law. The Court therefore turns to whether plaintiff Oveissi may state a legal claim for relief under French law for the murder of his grandfather.

### 1.      Overview of French Tort Law

Unlike the common law in the United States—which evaluates tort liability through the lenses of various causes of action, each of which is defined by specific and often narrowly-tailored elements—French law applies a "very broad" statutory basis for liability in tort. *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1429 (11th Cir. 1996) (citing *Mediterranean Gold, Inc. v. Hirsh*, 783 F. Supp. 835, 841 n.6 (D.N.J. 1991)). In particular, French tort law is governed by a handful of general principles found in Articles 1382-86 of the French Civil Code. For purposes of this case, of particular importance are Articles 1382, 1383 and Section 1 of Article 1384, which articulate governing precepts concerning liability for causing injury and wrongful death, and set forth the responsibility of principals for their agents' actions. They read as follows:

> *Tout fait quelconque de l'homme, qui cause à autrui un dommage, oblige celui par la faute duquel il est arrivé, à le réparer.* Article 1382 (Civil Code of France) (translated: "Any act whatever of man, which causes damage to another, obliges the one by whose fault it occurred, to compensate it.").
>
> *Chacun est responsable du dommage qu'il a causé, non seulement par son fait, mais encore par sa négligence ou par son imprudence.* Article 1383 (Civil Code of France) (translated: "Everyone is liable for the damage he causes not only by his intentional act, but also by his negligent conduct or by his imprudence.").
>
> *On est responsable non seulement du dommage que l'on cause par son propre fait, mais encore de celui qui est cause par le fait des personnes dont on doit répondre, ou des choses que l'on a sous sa garde.* Article 1384, Section 1 (Civil Code of France) (translated: "A person is liable not only for the damages he causes by his own act, but also for that which is caused by the acts of persons for whom he is responsible, or by things which are in his custody.").

George Rouhette, *Civil Code*, Legifrance (Oct. 20, 2010, 3:45 PM), http://www.legifrance.gouv. fr/html/codes_traduits/code_civil_textA.htm.  The principles contained in these statements constitute "the basis of every tort liability" under French law.  W. J. Wagner, *The Victim's Fault in Wrongful Death Actions in French Law*, 12 Am. J. Comp. L. 82, 82 (1963); *see also* George A. Bermann & Etienne Picard, *Introduction to French Law* 237 (2008) (noting that French tort law is "constructed on the basis of five articles of the Civil Code (Articles 1382–86).").

In the operative Amended Complaint, plaintiff sets forth claims for wrongful death and intentional infliction of emotional distress.  Amended Complaint at ¶¶ 10–16.  These two claims are similar in both structure and purpose, as both causes require claimants to demonstrate that a third party was wrongfully harmed and that they suffered as a result, and both causes are designed to compensate claimants harmed by the loss of another.  Though under French law there is no clearly-delineated cause of action analogous to those articulated in the Amended Complaint, the general principles governing French tort law, which "effectively treat all fault . . . as giving rise to a duty to compensate," Bermann & Picard, *supra*, at 237, do extend to encompass actions brought by claimants for harm suffered as a result of the wrongful deaths of third parties.  *See* Robert F. Taylor, *Concubinage and Union Libre: A Historical Comparison of the Rights of Unwed Cohabitants in Wrongful Death Actions in France and Louisiana*, 13 Ga. J. Int'l & Comp. L. 715, 739 (1983) (describing one "avowed purpose" of tort provisions of Napoleon Code of 1804 as "provid[ing] an action for personal damages resulting from the death of another through the delictual action of a third party").  Indeed, the Supreme Court of the United States has recognized that Article 1382 of the French Civil Code provides redress for claims of wrongful death.  *See La Bourgogne*, 210 U.S. 95, 138 (1908) ("[I]t may not be doubted that in France . . . such right of action [for wrongful death] has been constantly recognized and

enforced from the date of the enactment of the Code."); *see also Belieu v. Murray*, 231 F. Supp. 579, 582 (E.D.S.C. 1964) (noting that Articles 1382–1384 of French Civil Code encompass "actions for personal injuries and for wrongful deaths").  Plaintiff's general theory of recovery—that he should be compensated for the death of his grandfather—is therefore actionable under French law.

### 2.     Threshold Legal Issues

Before turning to the requirements to state and prove a claim under French law, this Court must first examine whether the legal bars that prevented plaintiff from pursuing his claims in *Oveissi I* persist under the law of France.  In *Oveissi I*, this Court found "Iran and MOIS culpable in the brutal murder of plaintiff's grandfather, Gholam Ali Oveissi."  498 F. Supp. 2d at 284.  Despite this determination, the Court dismissed plaintiff's claims as barred by two legal doctrines.  First, the Court dismissed plaintiff's wrongful death claim on the basis of the common law rule that wrongful death claims may only proceed "provided that the deceased would have had a cause of action if he had been merely injured and not killed."  *Id*. at 277 (citing Restatement (Second) of Torts § 925 cmt. A (1971)).  Because Gholam Ali Oveissi would not have met the jurisdictional thresholds imposed by the FSIA, his grandson could not proceed on a theory of wrongful death.  Second, the Court barred plaintiff's claim for intentional infliction of emotional distress on standing grounds, as plaintiff did not qualify as a person "entitled to inherit property of the deceased," as necessary under California law.  *Id*. at 282.  Under French law, neither of these doctrines bar plaintiff's claims.

In contrast to the common law distinction between wrongful death and survival, which are distinguished by the issue of whether the claim "belongs" to the plaintiff or is derivative in nature and tied to the rights of the decedent, the law of France ignores any formalistic

distinctions: "There is no clear-cut distinction between survival and wrongful death actions; the plaintiffs recover damages either in their own name or as successors of the victim." Wagner, *supra*, at 82 (1963). Plaintiff's recovery is therefore not limited to causes of action that his grandfather would have been capable of asserting against defendants, and his attempt to recover for the loss of his grandfather may go forward.

With respect to the issue of standing, rather than adhering to clear-cut divisions defining groups entitled to seek compensation, the ability to bring an action for recovery based on injury befalling by another under French law is limited only by claimants' ability to demonstrate that they have been "directly injured" by the suffering of the third party. *La Bourgogne*, 210 U.S. at 139. Thus, neither Amir's kinship with his grandfather, nor his ability to legally inherit from him, affect his right of recovery. *See id.* (holding that under "settled interpretation [of French law] . . . the right to recovery for wrongful death is not dependent upon heirship or other relationship"); Taylor, *supra*, at 721–22 (discussing numerous cases in which French courts have held that ability to recover damages for loss of another is not tied to legally recognized relationships or kinship). As seen below, Amir has provided sufficient evidence to establish that he suffered as a result of his grandfather's murder, *see infra* Section IV.B.3, and he therefore has standing under French law to proceed.

In sum, French tort law "reject[s], by its very simplicity, all the distinctions and restrictions that other judicial traditions have developed through the sophisticated analysis of factual situations (as in the United Kingdom) . . . [and thus the French Civil Code] has in effect caused French Judges to give civil liability a broad scope." Bermann & Picard, *supra*, at 238. Having determined that the legal doctrines barring plaintiff from pursuing claims against defendants under California law pose no barrier to plaintiff under French law, the Court now

turns to whether plaintiff has provided sufficient evidence to warrant holding defendants civilly liable for the murder of Gholam Ali Oveissi.

### 3. Liability Under French Law

Applying the principles enunciated in Articles 1382-84, *supra*, the duty of French courts in tort actions is to determine whether a *faute* (fault or wrong) was committed, and whether the defendants are responsible for the harm caused by that wrong. The general nature of this inquiry—as opposed to the specific task of common law judges, who must evaluate whether defined elements of a given claim have been satisfied—"has given rise to a liability regime whose mission is to cover any harm whatsoever, as long as it was caused by a fault of any kind, without the right to compensation requiring any very particular causality." Bermann & Picard, *supra*, at 247. Within this broad sphere, "three categories of liability are distinguished: liability for one's own act (*la responsabilité du fait personnel*), strict liability for things (*la responsabilité du fait des choses*), and strict liability for acts of other persons (*la responsabilité du fait d'autrui*)." *European Tort Law* § 301-2 (Cees Van Dam ed., 2006). Here, because defendants Iran and MOIS did not themselves murder Gholam Ali Oveissi, plaintiff may only state claims against them on the basis of *la responsabilité du fait d'autrui*—the rough equivalent of the common law concept of vicarious liability. To establish liability on this basis, plaintiff must show (1) that the agents who killed his grandfather themselves committed a tort under French law, and (2) that the relationship between the Iran, MOIS and the murderers renders the defendants strictly liable for the death of Gholam Ali Oveissi. Here, there is sufficient evidence to satisfy both of these requirements.

### a. The Murder of Gholam Ali Oveissi by Defendants' Agents Constitutes a Compensable Harm Under French Law

Under French tort law, "to establish liability it is sufficient to prove intention or negligence (*faute*), damage (*dommage*), and causation (*lien du causalité*)." *European Tort Law*, *supra*, at § 302-1; *see also* Taylor, *supra*, at 720 ("In order that an act engage the responsibility of its author it is necessary first, that the act constitute a fault, second, that it be imputable to the author, and third, that it cause certain and actual injury."). The Court will examine each of these elements in turn.

*Fault*

Fault (*faute*) under French law is a broad and largely-undefined concept, and a primary role of the courts in the French tort system is to determine whether a particular act constitutes a *faute* under the law. There is little doubt here, however, that the intentional killing by gunshot of another human being constitutes such a wrong. Moreover, an established doctrinal rule aids the Court: "French law considers that the commission of any criminal offense itself constitutes a civil fault." John Bell *et al.*, *Principles of French Law* 366 (2d ed. 2008). This concept is known as the "unity of criminal and civil faults." *Id*. at 369; *see also European Tort Law*, *supra*, at § 302-1 ("[A] person commits a *faute* if he violates a statutory rule."). In *Oveissi I*, the Court determined that Gholam Ali Oveissi was shot and killed in a crowded Paris street, and that Islamic Jihad—working with the support and under the direction of Iran and MOIS—was responsible for his death. 498 F. Supp. 2d at 274. These acts constitute crimes under the French Penal code, which defines the crime of "murder" as "[t]he willful causing of the death of another person." French Penal Code tit. II, ch. I, § 1, art. 222-1 (2005). Thus, in addition to the crime of murder, the act of shooting Gholam Ali Oveissi, in broad daylight and without provocation, also constitutes a civil *faute* for purposes of French tort law.

*Causation*

French courts typically do not place a great deal of emphasis on the issue of causation, and—unlike their American counterparts—they have not devoted significant energy to the development of theories of causation. Instead, French courts look to two basic legal concepts. The first, known as "equivalence of condition," is roughly the equivalent of the common law's "but for" causation test, and is "satisfied by a connection of necessity in the sense that, without the act in question, the harm would not have occurred." Bermann & Picard, *supra*, at 258. The second, known as "adequate causation," can be analogized to the common law concept of proximate cause, and examines whether the injury that resulted from the act was "normally foreseeable, in the normal course of things." *Id.*; *see also* Bell *et al.*, *supra*, at 410 ("[C]ourts look to relate the claimant's harm to one of its antecedents which, normally, according to the natural course of events, was of a nature to produce it, in contrast to other antecedents of the harm, which would lead to it only as a result of exceptional circumstances.").

Here, there is no evidence to suggest that Gholam Ali Oveissi's death was caused by anything but the gunshot wounds he suffered by the hands of defendants' agents, operating as Islamic Jihad. Thus, had Iran and MOIS not directed the killers to attack former pre-revolution Iranian official such as the senior Oveissi, his premature death would not have resulted. Moreover, there can no doubt that defendants intended, or foresaw, any other result. Indeed, in *Oveissi I* the Court found that attacks such as this one "were intended to silence the Iranian regime's critics." 498 F. Supp. 2d at 273. In such circumstances, the actions of defendants' agents satisfy both the "equivalence of conditions" and "adequate causation" tests, and thus constitute the legal cause of Gholam Ali Oveissi's death.

*Harm*

Claimants under French tort law must also demonstrate that they suffered a harm, or *préjudice*. Bell et al., *supra*, at 412. The scope of *préjudice* "is extremely broad," and extends to "personal injuries, damage to or loss of property, *dommage moral* (a very broad category which includes psychiatric injury, grief, upset or mental distress), [and] inconvenience or what a common lawyer would call pure economic loss." *Id*. at 364. Indeed, "French law does not rule out any type of harm from recovery." *Id*. at 412. The only limitation to this rule is the requirement that claimants show "that injury to a legitimate interest occurred, with the understanding that the notion of legitimate interest is construed in a very liberal manner." Bermann & Picard, *supra*, at 257.

Here, plaintiff Oveissi is not seeking compensation for physical injuries that he suffered personally, but rather is attempting to recover the loss of financial support provided by his grandfather, and seeking compensation for the grief and emotional suffering he has experienced as a result of the assassination. Amended Complaint at ¶¶ 10, 12, 14. These indirect harms are actionable under the French doctrine of *dommage par ricochet*, which governs instances "where A claims respect of harm caused by B's injury or damage itself caused by the defendant's (C's) act." Bell *et al.*, *supra*, at 412. Such claims "may be based on mental distress or grief suffered as a result of the injury or death of a relative or friend . . . but may also include purely financial losses caused by another's personal injury." *Id*. at 412–13.

Here, the Court finds that the evidence is sufficient to establish that Amir Reza Oveissi was both emotionally and financially harmed by the murder of his grandfather. With respect to financial harm, the testimony and documentary evidence adduced by plaintiff demonstrates that Gholam Ali Oveissi "acted as a second father" to Amir, and financially supported Amir and his family during their time in Paris. *Oveissi I*, 498 F. Supp. 2d at 274. Moreover, the Amended

Complaint alleges that Gholam possessed "successful and industrious" business acumen, through which he was capable of generating "substantial earnings and profits" that, but for his murder, would have "accrued to his estate and as a consequence, his heirs," including his grandson. Amended Complaint at ¶ 8. These alleged losses are legally compensable, as French law recognizes and awards "purely financial losses caused by another's personal injury." Bell *et al.*, *supra*, at 412. And though Amir lost his grandfather and not his father, "French law does not require that the deceased had an obligation to maintain the claimant but that it is sufficient if he in fact maintained him." *European Tort Law*, *supra*, at § 1209. Thus plaintiff has sufficiently established financial harm resulting from his grandfather's assassination.

With respect to non-pecuniary harms, Amir's previous testimony was that "his grandfather's murder has defined who he is today," and that it has affected almost every aspect of his life. *Id.* The Court is satisfied as to the sincerity of Amir's grief, as well as the profound nature of the impact his grandfather's murder has had on his life. Plaintiff has thus demonstrated an actionable harm with sufficient evidence. *See* Pierre Catala & John Antony Weir, *Delict and Torts: A Study in Parallel*, 38 Tul. L. Rev. 663, 690 (1963) (noting that French wrongful death claimants may state claims for emotional harm "if they can satisfy the court of the sincerity of the grief caused them by the victim's death").

Plaintiff has thus shown that the actions of the Hezbollah agents, operating as Islamic Jihad, in murdering his father are actionable under French tort law. The Court now turns to the issue of whether defendants here may be held liable for such acts.

### b. Defendants Are Vicariously Liable for Harm Caused to Plaintiff by the Murder of Gholam Ali Oveissi

Article 1384 of the French Civil Code declares: "A person is liable not only for the damages he causes by his own act, but also for that which is caused by the acts of persons for

whom he is responsible." This statement of principle recognizes "the liability of a principal for the act of his agents." Bermann & Picard, *supra*, at 251. Under French law, once a defendant has been determined to be responsible for his agent's actions, there is no further defense to liability—he is *per se* liable. Bell *et al.*, *supra*, at 396 (noting that under French law, once vicarious liability has been established, there is no defense for lack of fault). In their interpretation of Article 1384, French courts have articulated a legal standard for vicarious liability that is quite similar to common law rules of agency liability. Under this test, claimants must demonstrate that (1) a relationship of subordination existed between the defendants and the agents who undertook the tortious acts; (2) the actions of those agents constituted a *faute* under Article 1382; and (3) the acts were within the scope of the agency relationship. Plaintiff has established each of these elements by sufficient evidence here.

### *Relationship of Subordination*

The first requirement for liability under Article 1384 is that "there must be a 'relationship of subordination' between the person whose act causes the harm . . . and the person to be held liable." Bell *et al.*, *supra*, at 395. Though classically thought of in the employer/employee context, this relationship extends to "the relationship between a person who occasionally places himself at the disposal of another for the purpose of accomplishing a task." Bermann & Picard, *supra*, at 251–52. Here, the evidence demonstrates that such a relationship exists. As testimony has established, members of Hezbollah acting under the name Islamic Jihad were acting "under the direction of MOIS," and were materially supported by Iran. *Oveissi I*, 498 F. Supp. at 273. The Court therefore previously determined that the "perpetrators" of Gholam Ali Oveissi's murder "were funded and controlled by defendant Iran through defendant MOIS." *Id*. at 274. This factual finding is sufficient to establish a relationship of subordination.

*Constituted a Fault*

The second Article 1384 requirement is that the agent's act, in and of itself, must have constituted an actionable fault. Bell *et al.*, *supra*, at 395. As demonstrated above, the murderer's actions here were clearly a *faute* under a French law, and thus this element is satisfied. *See supra* Section IV.B.3.a.

*Within Scope of Agency*

Finally, the agent must have been acting within the scope of his agency. *Id*. In *Oveissi I*, this Court summarized the testimony of terrorism expert Dr. Paz, who explained that Hezbollah was founded by Iranian agents. *Oveissi I*, 498 F. Supp. 2d at 273; *see also Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 101 n.5 (D.D.C. 2000) (referring to Hezbollah as Iranian "surrogate organization[]"). Dr. Paz also testified that the operations under the name Islamic Jihad were undertaken to "silence the Iranian regime's critics and to deter French intervention in Lebanon." *Oveissi I*, 498 F. Supp. 2d at 273. Furthermore, the testimony of the other witnesses at trial established that Gholam Ali Oveissi "was outspoken in his opposition to Iran's revolutionary government" and that he "advocated secular democracy and favored cooperation with the United States." *Id*. at 274. Based on these factual findings, it is a more than reasonable inference that his assassination kept with the overarching goals of Iran and MOIS, which Hezbollah and Islamic Jihad were meant to serve. The murder was thus undertaken within the scope of the agency relationship, and renders Iran and MOIS liable for the Gholam Ali Oveissi's death.

## V. CONCLUSION

On February 17, 1984, on a busy Paris street, members of Hezbollah operating under the *nom de guerre* Islamic Jihad brutally gunned down Gholam Ali Oveissi, a former Iranian general

and outspoken critic of the current Iranian government.  These individuals were acting at the direction of MOIS and Iran, and they assassinated Gholam for the purpose of furthering the Republic of Iran's agenda.  In these circumstances, defendants Iran and MOIS are *per se* liable for the actions of the murders under French law.  Bermann & Picard, *supra*, at 252.  Plaintiff Amir Reza Oveissi, the decedent's grandson—who at the time was five years old, lived with his grandfather, and was being raised with his love and support—is therefore entitled to be awarded damages as appropriate to replace the loss of financial and personal support, as well as to compensate him for the profound grief he has suffered as a result of his grandfather's brutal murder.

Due to the procedural posture of this case, however, the Court has not yet had an opportunity to make any findings of fact concerning damages.  In light of this gap in the record, plaintiff, in his supplemental briefing dated June 8, 2010, requested a hearing to set damages in this case, which the Court will grant.

Accordingly, it is here ORDERED that—

1.      judgment is entered against all defendants as to all issues of liability;

2.      the Clerk shall schedule an evidentiary hearing, at which time plaintiff may introduce evidence concerning the appropriate damages award; and

3.      plaintiff shall, no less than ten (10) days prior to the hearing, file a statement summarizing the evidence he intends to produce, and provide the Court with a damages estimate.

SO ORDERED

Signed by Royce C. Lamberth, Chief Judge, on November 12, 2010.