# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMIR REZA OVEISSI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 03-cv-1197 (RCL) |
| | ) | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

## I.  INTRODUCTION AND BACKGROUND

Plaintiff Amir Reza Oveissi brought this suit over seven years ago, seeking to hold

defendants Islamic Republic of Iran ("Iran") and the Iranian Ministry of Information Security

("MOIS") liable for the assassination of his grandfather, Gholam Oveissi. Gholam Oveissi was a

general and high-ranking official in Iran prior to the 1979 revolution, which saw the rise of

Ayatollah Khomeini and the transformation of Iran into an Islamic state. Shortly before the

revolution, General Oveissi and his family fled to the United States, where Amir Reza was born.

After a brief stay in the U.S., the family settled in Paris, France, where they resided for nearly

five years. Their stay in Paris was cut short, however, after Gholam Oveissi was gunned down in

a busy street in February 1984. Islamic Jihad—a relatively-unknown group at the time—

immediately claimed responsibility for the assassination. Following his brutal murder, the

remaining members of Gholam Oveissi's family, including five year-old Amir Reza, were

whisked away to Africa, and eventually made their way back to the United States, where plaintiff

has since resided. Since his grandfather's death, plaintiff—and the world—has learned that

Islamic Jihad was actually a cell composed of members of the terrorist organization Hezbollah, and that the group acted "under the direction of MOIS, and were materially supported by Iran." *Oveissi v. Islamic Republic of Iran*, ___ F. Supp. 2d __, __, No. 03 Civ. 1197, 2010 U.S. Dist. LEXIS 120168, at *35 (D.D.C. Nov. 12, 2010) ("*Oveissi III*") (quotations omitted).

Plaintiff Amir Reza Oveissi brings this action under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, seeking to hold both Iran and MOIS liable for their complicity in the murder of his grandfather. That Act contains a provision known as the "state-sponsored terrorism" exception, which, at the time plaintiff initiated his suit, was codified at 28 U.S.C. § 1605(a)(7) and "lifted the immunity of foreign states for a certain category of sovereign acts which are repugnant to the United States and the international community— terrorism." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 12 (D.D.C. 1998). Following seven years of litigation, this Court determined that plaintiff had provided sufficient evidence to establish that "Islamic Jihad was responsible for the murder of Gholam Ali Oveissi in Paris, France, and the agents carrying out the assassination were funded and controlled by defendant Iran through defendant MOIS." *Oveissi III*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120168 at *12. Following the directions of the D.C. Circuit, *see Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 844 (D.C. Cir. 2009) ("*Oveissi II*") ("We leave it to the district court on remand to evaluate the plaintiff's claims under French law."), this Court—applying the law of France[1]—found that the assassination of Gholam Oveissi was "undertaken within the scope of

---

[1] At the time plaintiff Amir Reza Oveissi brought this suit, the then-applicable state-sponsored terrorism exception, codified at 28 U.S.C. § 1605(a)(7), "was 'merely a jurisdiction conferring provision,' and therefore it did not create an independent federal cause of action against a foreign state or its agents." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 46 (D.D.C. 2009) (quoting *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1032 (D.C. Cir. 2004)). Thus, "plaintiffs in FSIA terrorism cases under § 1605(a)(7) began to use that provision as a 'pass-through' to causes of action found in state tort law." *Id.* (citing *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 83 (D.D.C. 2006)). Thus, a key issue in FSIA litigation based on the state-sponsored terrorism exception was the proper state law to apply. *See Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 266 (D.D.C. 2006) (noting that FSIA court "must determine the applicable state law to govern the action").

[an] agency relationship" between Islamic Jihad and defendants, and thus ordered "judgment [to be] entered against all defendants as to all issues of liability." *Oveissi III*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120168 at *37–38.

As a result of the original dismissal of plaintiff's cause of action, *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268 (D.D.C. 2007) ("*Oveissi I*"), the Court had not received any evidence concerning the appropriate measure of damages at the time that it rendered its opinion on liability in *Oveissi III*. Plaintiff, recognizing this gap in the record, requested leave to brief the Court concerning damages, Memorandum of Law on the Applicability of Relevant French Law 7–8, June 8, 2010 [45], which the Court granted. *Oveissi III*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120168 at *37–38. Plaintiff subsequently submitted a brief to the Court outlining his estimation of the appropriate measure of damages, and appending his own sworn declaration as well as those of his brother Amir Ali Oveissi and his father Mohammad Reza Oveissi. Damage Estimate and Brief in Support of Damage Award, Dec. 10, 2010 [49] ("Damage Estimate"). The Court then held an evidentiary hearing concerning damages on December 20, 2010, at which all three declarants from plaintiff's Damage Estimate appeared and provided sworn affirmations of the truth of their declarations. A few weeks after this hearing, the Court issued an Order in which it observed that "in any FSIA litigation, recoverable economic losses are limited to those that '*result* from decedent's premature death,'" Order 3, Jan.

---

This Court originally determined that the United States' "unique interest in having its domestic law apply when its citizens are injured by state-sponsored terrorist acts"—an interest that "elevates the interests of the United States to nearly their highest point"—required application of U.S. law to plaintiff's claims against Iran. *Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 281 (D.D.C. 2007) (quotations omitted). In particular, the Court held that California law should be applied, as that was the state where plaintiff was born. *Id.* The Court then found that plaintiff could not state a claim for relief for wrongful death under California law because the California probate code did not permit him to recover in such an action, and dismissed the suit *Id.* at 282.

Plaintiff appealed the dismissal to the D.C. Circuit Court of Appeals, which held that the relevant choice-of-law factors "overwhelmingly point in the direction of France" because (1) the deceased Gholam Oveissi was an Iranian decedent and French domiciliary and (2) Iran's goal in perpetrating the assassination was to deter French intervention in Iranian affairs. *Oveissi II*, 573 F.3d at 842–43. The Court of Appeals thus remanded the case with instructions to apply French law in evaluating plaintiff's claims. *Id.* at 844.

7, 2011 [50-1] (emphasis in original; quoting *Flatow*, 999 F. Supp. At 27), and invited plaintiff to submit additional evidence to "establish, to the satisfaction of the Court, that [Amir Reza] would have experienced some economic gain as a result of his grandfather's holdings (and quantify that gain), and . . . demonstrate that the assassination of Gholam Oveissi was the cause of his alleged economic losses." *Id*. In response, plaintiff submitted a supplemental brief and new evidence to address the concerns raised by the Order. Supplemental Memorandum in Support of Plaintiff's Damage Estimate, Feb. 4, 2011 [53] ("Supp. Br."). On the basis of all the evidence submitted by plaintiff here, as well as judicial notice of certain evidence presented in *Oveissi I*,[2] the Court makes the following factual findings, and awards damages as appropriate.

## II.    FINDINGS OF FACT

The evidence submitted by plaintiff tends to fall into one of three categories: evidence related to the nature of his relationship with, and reaction to the death of, his grandfather Gholam Oveissi; evidence concerning the extent of General Oveissi's former properties and businesses in Iran; and evidence concerning how Amir Reza would have benefited from his grandfather's holdings had he not been assassinated. The Court discusses each of these subjects in turn.

### A.    Evidence Concerning Plaintiff's Relationship with his Grandfather

In *Oveissi I*, plaintiff submitted substantial evidence concerning his relationship with his grandfather, the deceased Gholam Oveissi. Plaintiff now supplements that information by submitting sworn declarations from both himself and his brother, Amir Ali Oveissi. These combined proofs establish the following facts:

General Gholam Oveissi was a prominent figure in pre-revolution Iran. He was "a four-star general in Iran's armed forces," *Oveissi I*, 498 F. Supp. 2d at 274–75, and was closely linked

---

[2] Though plaintiffs did not specifically move the Court to take judicial notice of the evidence presented in *Oveissi I*, the Court is permitted to take judicial notice on its own initiative. Fed. R. Evid. 201(c).

with the ruling Shah of Iran prior to the Shah's overthrow in 1979. *Id.* Contemporary accounts of General Oveissi describe him as "one of the most powerful Iranian generals," and state that he was "the commander of the imperial Iranian army." Dec. 10, 2010 Declaration of Amir Reza Oveissi[3] ("Amir Reza 1st Decl.") at ¶¶ 2–3 & Exs. A–B. Plaintiff also submits numerous photographs and other documentary evidence to the Court that corroborate General Oveissi's position as one of power and prestige during the Shah's rule of Iran. *See id.* at Exs. K–P.

Following his flight from Iran and the birth of his grandchildren—including plaintiff— Gholam Oveissi became very close to his family. Indeed, plaintiff Amir Reza Oveissi remembers his grandfather being present for virtually all of his life prior to the assassination. *Id.* at ¶ 5. The family moved to the United States following the overthrow of the Shah in 1979, and shortly thereafter they all moved to Paris. *Oveissi I*, 498 F. Supp. 2d at 274. During this period, the entire family—including Gholam Oveissi—was always together, *id.*, and plaintiff submits several family photos of the whole family together at various times and in various places, all of which include both him and his grandfather. Amir Reza 1st Decl. Exs. C–I. Once the entire family arrived in Paris, they lived in the same apartment together. *Oveissi I*, 498 F. Supp. 2d at 274. They were a "very close and loving family." Amir Reza 1st Decl. ¶ 6.

In addition to the physical proximity between plaintiff and his grandfather, the two also shared a special bond. They would see each other almost every day, and his grandfather always came with his father to pick him up from daycare. *Id.* at ¶ 14. He and his grandfather would take special trips together, just the two of them, going to the park for a picnic or to one of Paris' great museums. *Id.* Amir Reza's grandfather also acted as his Farsi instructor. *Id.* This relationship between grandson and grandfather was a special one, as Gholam Oveissi filled the

<hr />

[3] The Dec. 10, 2010 Declaration of Amir Reza Oveissi is found on pages 24–78 of plaintiff's Damage Estimate. Citations are made by reference to the Declaration, rather than to the entire submission.

role of father-figure and mentor who "was always very patient" with the young Amir Reza Oveissi. *Id.* at ¶ 15. Indeed, plaintiff's brother explains that his grandfather was "particularly fond" of Amir Reza. Dec. 10, 2010 Declaration of Amir Ali Oveissi[4] ("Amir Ali Decl.") ¶ 2. As a result of this special relationship, during this period plaintiff "did not really distinguish between" his father and his grandfather. Amir Reza 1st Decl. ¶ 16.

Following Gholam Oveissi's brutal murder, plaintiff's shock at the loss of such a close and important figure in his life was amplified by the fact that—from his perspective—Gholam Oveissi's death was entirely unexpected. Though Gholam himself remained active in the movement to retake Iran and re-install the Shah as the secular leader of that country, *Oveissi I*, 498 F. Supp. 2d at 274, plaintiff—at the time a young child less than six years old—was unaware that his grandfather was in any danger at all. Amir Reza 1st Decl. ¶ 18. In plaintiff's mind, Paris was a safe place where he was surrounded by family; indeed, the very street on which Gholam Oveissi was gunned down—Rue de Passy—was a place where Amir Reza "would often go for walks with [his] grandfather," and where his grandfather "would buy [him] and [his] brother ice cream." *Id.* at ¶ 19. As a result, plaintiff testified that the murder of Gholam Oveissi "was a complete shock" which jarred him from his normal life. *Id.* at ¶ 18. This unpreparedness for the loss of his grandfather was not without consequences; plaintiff's brother explains that plaintiff would occasionally suffer "outbursts of anger" at the fact that the assassination was so "unexpected and violent." Amir Ali Decl. ¶ 6.

In addition to the suddenness and surprise of Gholam Oveissi's death, the evidence demonstrates that the murder also had a lingering and terrifying impact on the lives of Amir Reza and his family. Shortly after General Oveissi was killed, the entire family was whisked away to

---

[4] The Dec. 10, 2010 Declaration of Amir Ali Oveissi is found on pages 86–87 of plaintiff's Damage Estimate. Citations are made by reference to the Declaration, rather than to the entire submission.

Morocco, in fear of further reprisals.  *Oveissi I*, 498 F. Supp. 2d at 274.  At the time, plaintiff did

not understand why they were leaving, nor why they were in such a hurry—he did not even learn

of his grandfather's brutal murder until after the family arrived in Morocco.  Amir Reza 1st Decl.

¶ 21.  This sudden and violent disruption in plaintiff's life had a significant impact; as plaintiff

himself explains, to be whisked away from his "comfortable" life in Paris, surrounded by family

and friends, at the age of five "was an extremely traumatic experience."  *Id.* at ¶ 21.

Only adding to the trauma was the lingering threat that the same terrorist group that killed

General Oveissi would come after additional members of plaintiff's family.  *See* Amir Ali Decl.

¶ 7 ("Because our grandfather was a target of Iranian extremists, our parents feared another

assassination attempt on our immediate family.").  Indeed, in addition to Gholam Oveissi,

plaintiff's great-uncle—Gholam's brother—was also murdered in the same attack.  Amir Reza

1st Decl. ¶ 20.  And had plaintiff's mother not called his father to ask him to come home and

help sell their car, plaintiff's father might also have been killed, as he had been with Gholam and

plaintiff's great-uncle just prior to the murder.  *Id.*  Living in this constant state of terror and fear

was a heavy burden for the young Amir Reza, who felt like he was "in hiding" and was

constantly reminded that the same dangerous forces that killed his grandfather remained at large

and possibly interested in targeting other members of his family.  Furthermore, Amir Ali Oveissi,

plaintiff's brother, explains that after the assassination "[b]odyguards carrying guns [became] a

common sight in our home," and that this period "was a very difficult time for Amir [Reza]."

Amir Ali Decl. ¶ 7.  In short, the murder of Gholam Oveissi turned plaintiff's "peaceful and

loving home into a place of chaos and turmoil."  Amir Reza 1st Dec. ¶ 35.

All of these facts concerning the nature of the attack in this case had a substantial impact

on the loss that plaintiff felt at the murder of his grandfather, and have hindered his ability to

recover from that loss. Plaintiff's brother explains that plaintiff became withdrawn following Gholam's death, and the family never again saw the playful and cheery child that Amir Reza once was. Amir Ali Decl. ¶ 4. This withdrawn nature eventually gave way to a troubled child who suffered from outbursts of anger and fits of denial in which plaintiff would act as if his grandfather was still alive. *Id.* at ¶¶ 5–6. As Amir Reza began to accept what had happened, he fell into a long period of depression, and throughout his adolescence he battled alcoholism as he attempted to cope with the tragic event. Amir Reza 1st Decl. ¶ 22. Now an adult, plaintiff feels compelled to frequently remind himself of the assassination, keeping mementos close by and repeatedly reviewing film footage discussing his grandfather's murder. *Id.* at ¶¶ 23–25. The loss of Gholam Oveissi has even affected plaintiff's career choices, as he chose to study comparative politics and focus on the Middle East and Iran throughout his education—even though doing so provided constant reminders of the tragedy. *Id.* at ¶ 38. In sum, the murder of plaintiff's grandfather "has defined who he is today." *Oveissi I*, 498 F. Supp. 2d at 274–75.

**B.     Evidence Concerning Gholam Oveissi's Property Holdings in Iran**

In addition to the substantial emotional pains that plagued him, plaintiff also seeks to recovery pure economic losses that he and his family suffered as a result of General Oveissi's assassination. In particular, the Complaint in this action alleges that Gholam Oveissi "lost his property, earnings, profits and monetary value that would have accrued to his estate," and that plaintiff, as an heir to that estate, suffered losses from the destruction of his "right[] to inherit this property." Amended Complaint at ¶ 8. To support his allegations, plaintiff submits a declaration from his father, Mohammad Reza Oveissi, who "managed the real estate holdings owned by . . . Gholam Oveissi, in Iran." Dec. 10, 2010 Declaration of Mohammad Reza Oveissi[5]

---

[5] The Dec. 10, 2010 Declaration of Mohammad Reza Oveissi is found on pages 80–85 of plaintiff's Damage Estimate. Citations are made by reference to the Declaration, rather than to the entire submission.

("Mohammad 1st Decl.") ¶ 2. Because he occupied that role, plaintiff's father possesses "personal knowledge of the assets" and the ability to provide an "approximate value of those assets." *Id.* Mohammad Oveissi declares in his sworn statement that Gholam Oveissi owned several properties, and provides the estimated value of these properties in U.S. dollars as of 1979—before General Oveissi and his family fled Iran. The assets are summarized below.

| Description of Property | Estimated Value (USD)[6] |
| --- | --- |
| 800,000 square meters of land in the city of Gonbad | $88,000,000 |
| 100,000 square meters of land in the city of Nowshahr | $15,000,000 |
| 5,000 square meters of land in the city of Tehran | $1,500,000 |
| Twelve-bedroom home in the city of Tehran | $5,000,000 |
| 300,000 square meters of land in the city of Gorgan | $36,000,000 |
| 1,000,000 square meters of land in the city of Babol | $175,000,000 |
| 1,500,000 square meters of land in the city of Ghom | $225,000,000 |
| Rezabad farm near the city of Kashoun | $1,000,000 |
| Saidabad farm near the city of Kashoun | $1,000,000 |

*Id.* at ¶¶ 4–5. In total, plaintiff's father estimates the value of these combined properties, all of which were "located in prime areas of populated cities," *id.* at ¶ 7, to be $547,500,000.

In addition to the sale-value of the assets, some of the properties that Gholam Oveissi owned produced annual income. In particular, plaintiff's father explains that two farms owned by Gholam Oveissi "produced fruit, including apples, melons, pears, walnuts, cherries, prunes, and watermelons." *Id.* at ¶ 8. This yearly haul of produce was sold annually at various markets throughout Iran. Based on the revenue from the final years before he lost the ability to oversee the production and sale of the produce, Mohammad Oveissi estimates that the "yearly earnings

---

[6] Estimated values are provided here in U.S. dollars for ease of determining damages in this action. Generally, to reach these estimates, Mohammad Reza Oveissi first calculated the value of these properties by multiplying their size in square meters by the price per square meter in Iran's 1979 currency—the Toran. Mohammad 1st Decl. ¶ 4. He then converted these calculations to U.S. dollars using the 1979 exchange rate. *Id.* With respect to the two farms that Gholam Oveissi owned, however, Mohammad Oveissi estimated the value of each "based on [his] familiarity with the farms" located in the region. *Id.* at ¶ 5.

from the sale of produce from the farmland" was "between $4 million and $5 million." *Id.* In addition to the farms, Gholam Oveissi also operated an irrigation enterprise based on water rights he owned in the Atrek River. *Id.* at ¶ 6. In the years leading up to 1979, the annual earnings of this business were approximately $2 million. *Id.*

### C. Evidence Concerning Plaintiff's Losses Resulting from the Assassination

Finally, in response to this Court's Order, plaintiff submits evidence as to how he would have benefitted from his grandfather's assets in Iran, and whether the murder of Gholam Oveissi was the cause of the alleged losses in this case. Initially, plaintiff sets forth two methods of distribution from which he might have benefitted from his grandfather's holdings. First, Amir Reza's father explains that he was one of five children of Gholam Oveissi, and thus under a per stirpes distribution, plaintiff would have been in line to inherent one-half of his father's interest in General Oveissi's assets, which was one-fifth of the entire estate. Supp. Br. at 4; Feb. 3, 2011 Declaration of Mohammad Reza Oveissi[7] ¶ 2 ("Mohammad 2d Decl."). Second, plaintiff's father explains that, had Gholam Oveissi passed on his estate through a will, it is likely that he would have received greater than one-fifth share of the estate, as he "had the closest relationship" with General Oveissi, "worked in the family business," and had previously "managed all of [the] real estate holding[s] in Iran." Mohammad 2d Decl. ¶ 3. Mohammad Oveissi also states that Gholam Oveissi frequently would tell him, during their time in Paris, that he "inten[ded] to reclaim his property in Iran and turn over all of the property and businesses to me." *Id.* Finally, plaintiff avers that he is also appearing in this action as his family's representative of Gholam Oveissi's estate," Feb. 3, 2011 Declaration of Amir Reza Oveissi[8] ("Amir Reza 2d Decl."), and

---

[7] The Feb. 3, 2011 Declaration of Mohammad Reza Oveissi is found on pages 25–26 of plaintiff's Supp Br. Citations are made by reference to the Declaration, rather than to the entire submission.

[8] The Feb. 3, 2011 Declaration of Amir Reza Oveissi is found on page 14 of plaintiff's Supp. Br. Citations are made by reference to the Declaration, rather than to the entire submission.

thus "there is a legal and factual basis upon which to award [him] the full value of the property stolen by Iran." Supp. Br. at 5.

As to the relationship between the assassination and the loss of property in Iran, the evidence shows that General Oveissi was a powerful an influential leader in pre-revolution Iran. As a former four-star general in Iran's armed forces and one-time commander of the country's army, *see supra* Section II.A, plaintiff asserts that his grandfather "was perhaps the most influential [Iranian] expatriate in the world." Supp. Br. at 7. In support of this position, plaintiff submits a 2008 report from the Iran Human Rights Documentation Center, an independent organization whose goal is to "establish a comprehensive and objective historical record of the human rights situation in the Islamic Republic of Iran since the 1979 revolution." Iran Human Rights Documentation Center, *No Safe Haven: Iran's Global Assassination Campaign* (2008), *available at* http://www.iranhrdc.org/httpdocs/English/pdfs/ Reports/No-Safe-Haven_May08.pdf ("IHRDC Report"). The IHRDC Report provides details of General Oveissi's exile from Iran and his assassination in 1984. It explains that plaintiff's grandfather had attracted a number of former officers committed to returning and overthrowing the new Iranian government, *id*. at 23–24, that he received "substantial financial backing" from the Shah's family, *id*., and that, at least according to his own estimates, he had rallied over 7000 former troops and 90,000 volunteers to his cause. *Id*. In light of these circumstances, the IHRDC Report explains that Iran's "revolutionary authorities treated Oveissi as a very real threat," and notes that his "death dealt a major setback" to the attempts to re-establish the pre-1979 regime in Iran. *Id*.

## III.    DAMAGES

"In determining the appropriate amount of compensatory damages, the Court may look to prior [FSIA] decisions" for guidance. *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229,

269 (D.D.C. 2006).[9]  Here, however, French law controls the disposition of this action, *see supra*

Section I, and thus to the extent the law of France would restrict (or enhance) available damages

under the FSIA, the Court must account for such differences.

In French tort law, the "fundamental principle that dominates the evaluation of damages

is the principle of 'full compensation' (*la réparation intégrale*)."  George A. Bermann & Etienne

Picard, *Introduction to French Law* 260 (2008); *see also* John Bell et al., *Principles of French

Law* 414 (2d ed. 2008) (Under French law, "there must be 'full reparation' (*réparation

intégrale*).").  In contrast to the United States tort system, which incorporates and attempts to

balance often-competing goals of compensation, deterrence, and punishment, the foundational

tenet of *réparation intégrale* reflects France's policy determination that its civil tort system

should be limited solely to a restorative function.  As one French opinion explains:  "The proper

function of civil liability is to re-establish as exactly as possible the balance of things destroyed

by the harm and to replace the victim, at the expense of the person held liable, in the situation in

which he would have been if the harm had not occurred."  *Civ. (2)*, 8 Apr. 1970:  *Bull Civ. II*

n.111; *see also Belieu v. Murray*, 231 F. Supp. 579, 583 (E.D.S.C. 1964) ("The essence of civil

liability [in France] is to require re-establishment, as exactly as possible, of the equilibrium

destroyed by the wrongdoer and to replace the injured party . . . in the same situation as if the

tortuous act had not occurred.") (internal quotations omitted).

Here, the harms plaintiff has constitute a form of damage under French law known as

*dommage par ricochet*, "which governs instances 'where A claims respect of harm caused by B's

[9] Though the operative Complaint seeks punitive damages in addition to a compensatory award, Amended Complaint at Count IV, such an award is not available under the former state-sponsored terrorism exception.  *See Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 198 (D.D.C. 2008) ("As a general rule, [under § 1605(a)(7)] punitive damages are not available against foreign states.").  Nor does French law permit such relief. *See* George A. Bermann & Etienne Picard, *Introduction to French Law* 261 (2008) ("French law formally rejects the notion of punitive damages.").  Recognizing these well-established principles, plaintiff did not seek any punitive award in his Damage Estimate filed with the Court, and his counsel represented at the December 20th evidentiary hearing that plaintiff was not seeking such an award in this case.

injury or damage itself caused by the defendant's (C's) act.'" *Oveissi III*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120168 at *31 (quoting Bell *et al.*, *supra* at 412). Compensation for such injuries extends to both economic and non-economic losses. Bermann & Picard, *supra* at 257. Non-economic damages—known as *dommage moral*—compensate plaintiffs for "the sadness which is caused by the loss of a loved one," and thus are similar in nature to the common law notion of solatium. Robert F. Taylor, *Concubinage and Union Libre: A Historical Comparison of the Rights of Unwed Cohabitants in Wrongful Death Actions in France and Louisiana*, 13 Ga. J. Int'l & Comp. L. 715, 720-21 (1983). Economic damages—known as *dommage material*—result from "the cessation of assistance provided by the deceased," and are roughly similar to the common law's award for loss of support. *Id*. Plaintiff here seeks both forms of compensation. Damage Estimate at 2–15.

Based on these principles, as well as the Court's previous recognition that the scope of the French concept of *préjudice*, or harm, is "'extremely broad,'" *Oveissi III*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120168 at *30 (quoting Bell *et al.*, *supra* at 364), the Court may safely presume that none of the general practices and procedures that the courts of this district have developed with respect to damage awards under the FSIA will violate any tenet of the French law of damages. The Court will thus rely on previously-articulated principles concerning damage awards in FSIA litigation, with reference to French law where such information is available and may aid the Court in reaching an appropriate determination of damages.

A.      Solatium

"Solatium is awarded to compensate . . . 'the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent['s] society and comfort.'" *Murphy v. Islamic Republic of Iran*, ___ F.

Supp. 2d __, __, No. 06 Civ. 596, 2010 U.S. Dist. LEXIS 101250, at *69 (D.D.C. Sep. 24, 2010)

(quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)).  In his brief,

plaintiff seeks an award of $10 million in solatium.  Damage Estimate at 5–15.  For the reasons

set forth below, the Court finds that an award of $7.5 million is appropriate in this case.

### 1.    Standard

Solatium, as an award for "injury to feelings," *Flatow*, 999 F. Supp. at 30 (citing *Black's*

*Law Dictionary*, 1391 (6th ed. 1991)), is difficult to articulate in mathematical or numerical

terms.  A court's job in a solatium case is to account for various facts and circumstances, and to

use those factors to arrive at an appropriate numerical expression of total pain and grief—

encapsulated in the solatium award.  Here, the Court here is aided by those decisions in this

district on the issue of compensatory awards for family members of persons injured or killed in

FSIA cases.  In particular, the Court will look to other FSIA opinions concerning solatium

damages, as well as awards for the pain and suffering of family members of victims of terrorist

attacks who allege claims of intentional infliction of emotional distress, as such claims are

largely indistinct from claims for solatium.  *See Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist.

LEXIS 101250 at *69–70 ("In determining the appropriate award of damages for solatium, the

Court may look to prior decisions awarding [pain and suffering] for intentional infliction of

emotional distress as well as the decisions regarding solatium."); *Heiser*, 466 F. Supp. 2d at 269

(same); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 58 (D.D.C. 2006) (same).

This Court is well-versed in the history of FSIA litigation, and a review of relevant law

finds that there are several general principles concerning damages in such cases:  First,

"[f]amilies of victims who have died are typically awarded greater damages than families of

victims who remain alive."  *Rimkus v. Islamic Republic of Iran*, 575 F. Supp. 2d 181, 198

(D.D.C. 2008) (citing *Heiser*, 466 F. Supp. 2d at 269). Second, a critical component in determining the appropriate award is the "nature of the relationship" between the claimant and the victim. *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006). And third, another key factor in calculating damages is the "severity and duration of the pain suffered by the family member." *Id*.

Relying on these principles, this Court has developed a general framework for the calculation of proper damage awards in FSIA cases. *See generally Heiser*, 466 F. Supp. 2d at 269–70. The *Heiser* Court began by reviewing a substantial number of FSIA damage awards and determining, based on average awards, that "[s]pouses typically receive greater damage awards than parents [or children], who, in turn, typically receive greater awards than siblings." *Id*. at 269 (collecting cases). Finding that these transitive relationships were an efficient way—at least in the first instance—to measure the "nature of the relationship" between the claimant and victim, the Court then calculated the average damage awards for each of these general groups. Those calculations indicated that, as a general matter, spouses of deceased victims were awarded approximately $8 million, while parents and children received $5 million and siblings received $2.5 million. *Id*. These averages have since been explicitly adopted as a framework that provides starting points for solatium or pain and suffering damages for family members of deceased or injured victims in FSIA actions. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2009) (noting that this Court has "adopted the framework set forth in *Heiser* as 'an appropriate measure of damages for the family members of victims'") (quoting *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 51 (D.D.C. 2007)).[10] And that framework has been repeatedly applied to subsequent FSIA cases. *See, e.g.*, *Murphy*, ___ F.

---

[10] The framework has also been applied to cases where the victim survived a terrorist attack. In such cases, the awards are "valued at half of the awards to family members of the deceased"—$4 million, $2.5 million and $1.25 million to spouses, parents/children, and siblings, respectively. *Valore*, 700 F. Supp. 2d at 85.

Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *70–71; *Valore*, 700 F. Supp. 2d at 85–86;

*Beer v. Islamic Republic of Iran*, 574 F. Supp. 2d 1, 13 (D.D.C. 2008).

This procedure constitutes useful guidance for FSIA courts; however, "[t]hese numbers . . . are not set in stone." *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *71. While the *Heiser* framework provides a starting point for a court, it is simply that—a starting point. In particular, the *Heiser* figure accounts for the nature of the familial relationship between claimant and victim—a factor which may or may not capture all information relevant to the Court's damages analysis. Where that factor cannot tell the whole story, however, a court must consider other factors that may alter the determination of the appropriate award. In other words, the *Heiser* valuations act as a center of gravity for solatium awards, around which a court may vary the final amount based on the facts and circumstances of a particular case.

Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case, and it is that court's duty to analyze the nature of the claimant's injury and the deviation—if any—that is appropriate to compensate for such losses, while also bearing in mind the general precept that similar awards should be given in similar cases. Factors pertinent to the determination of damage enhancements are largely derived from common sense, and generally fall into one of three categories: evidence establishing an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing.

Finally, any departures from the *Heiser* framework, are generally small relative to the award specified by the developed framework, absent "circumstances that appreciably worsen" a

claimant's "pain and suffering, such as cases involving torture or kidnapping." *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006); *see also Haim*, 425 F. Supp. 2d at 75 ("[F]amilies of hostage or captivity victims are . . . typically awarded greater damages than are the families of victims of a single attack."). In such cases, greater awards are justified because the afflicted party not only had to cope with the grief that follows the loss of a loved one, but—at the time of the event—was also forced to endure unending anxiety and an extended period of extreme distress over the health and safety of their captive family member. Based on all of the above principles, the Court reaches the following conclusions concerning the appropriate award for solatium here.

### 2. Measure of Damages for Solatium in this Case

In determining appropriate damages here, the Court must grapple with two issues: first, where plaintiff—who lost his grandfather—should be placed on the *Heiser* framework; and second, whether the circumstances of this case warrant a departure from that initial position. The difficulty with this first issue results largely from the fact that, historically, American victims of terrorism tend to be in their twenties and thirties; indeed, the Court is unaware of prior FSIA litigation discussing either the nature of the grandparent-grandchild relationship or the proper placement of such a relationship on the *Heiser* scale. However, the Court need not delve into this issue here. As plaintiff correctly points out, this Court has previously determined that the interactions between Amir Reza and his grandfather were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship. *See Oveissi III*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120168 at *32 (finding that "Gholam Ali Oveissi 'acted as a second father' to Amir, and financially supported Amir and his family") (quoting *Oveissi I*, 498 F. Supp. 2d at 274). Based on these prior holdings, as well as

plaintiff's extensive testimony concerning the close nature of his relationship with his grandfather, *see* Amir Reza 1st Decl. at ¶¶ 4–20, the Court finds that the appropriate initial award in this case is $5 million—the same as for a parent-child relationship.[11]

With respect to any circumstances warranting a departure from this initial number, plaintiff urges that several "factors justify a higher award of compensatory damages for the mental anguish, bereavement, and grief suffered by [Amir Reza] Oveissi as a result of Gholam's murder." Damage Estimate at 7. In particular, plaintiff notes that (1) Amir had a particularly close relationship with his grandfather, (2) General Oveissi's death was sudden and completely unexpected, (3) the nature of General Oveissi's position led to events which caused plaintiff to suffer more severely than others whose relatives have been killed in terrorist attacks, and (4) plaintiff has suffered a feeling of permanent loss which has changed his life in significant and grave ways. *Id*. at 7–15. The Court discusses each of the factors in turn.

*Amir and Gholam's Relationship*

Plaintiff contends that the nature of his relationship with Gholam Oveissi was similar to that of a parent and child, and that this particularly special and close bond—unique for a grandparent and their grandchild—warrants an upward enhancement from the standard $5 million amount set by the *Heiser* framework. Damages Estimate at 7–8. Plaintiff is correct that this Court has recognized that a particularly close relationship is one factor weighing in favor of enhancement, *cf. Valore*, 700 F. Supp. 2d at 86 (holding that *actual* connection between family members, despite familial relationship, can affect ultimate solatium award), and the evidence chronicled above does demonstrate that Amir Reza and his grandfather shared a very special relationship. *See supra* Section II.A. However, it is natural that a parent is likely to have a

---

[11] Moreover, even if the *Heiser* framework were inapplicbale, under French law, "[c]ompensation for non-pecuniary loss is granted for . . . the loss or serious injury of a loved one." *European Tort Law* § 1202-1 (Cees Van Dam ed., 2006). Plaintiff's loss of his beloved grandfather undoubtedly qualifies under this standard.

stronger bond and closer day-to-day relationship than, for example, a sibling of a victim (or a grandparent, which was Gholam Oveissi's familial role.) Indeed, this is precisely the reason why the starting point for parents of victims is higher than that of siblings on the *Heiser* scale—to account for the natural differences between the two relationships. To further amplify damages based on the same variations through enhancements to the *Heiser* values would render the entire purpose of developing such a framework obsolete. Rather, enhancements are warranted where differences can be established between *similarly situated individuals*; i.e., where a parent can demonstrate a *particularly* close connection with their child vis-à-vis other parent-child relationships. Here, however, the evidence merely establishes that Gholam Oveissi's relationship with plaintiff was *like* that of a father-son relationship, in that Gholam was a constant and supportive presence in Amir Reza's life. This is the very reason that the Court determined that the proper starting point for solatium damages in this action is on the parent-child point of the *Heiser* scale, and any further alteration is therefore unnecessary and excessive.

### *Gholam Oveissi's Sudden and Unexpected Death*

Plaintiff also points to the sudden and unexpected nature of Gholam Oveissi's death to justify an upward enhancement. Damage Estimate at 9–10. As set forth above, at the time of the murder, plaintiff—a child of less than six years—was entirely unaware that his grandfather was in any danger at all. They would often go for walks and trips through Paris; indeed, the very place where Gholam Oveissi was killed was a street that he and plaintiff often visited together. *See supra* Section II.A. And though General Oveissi was involved with others in planning a return to Iran—thus rendering him a target of the current regime—plaintiff was ignorant of these facts, and thus his subjective view—and the shock he experienced—should not be mitigated.

Courts have previously recognized that whether the victim's death was "sudden and unexpected" is an issue to consider in the calculation of solatium damages. *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 90 (D.D.C. 2002). As the *Stethem* Court explained, where the death of a loved one is unforeseen, it can render the shock and grief suffered by family members "all the more intense." *Id*. Here, the evidence has demonstrated that plaintiff suffered from extended denial and outrage at the loss of his grandfather, unable to accept that he was suddenly gone. *See supra* Section II.A. And unlike the relatives of many victims in FSIA cases—whose children or siblings were serving in the U.S. armed forces, and thus were inherently exposed to at least some level of risk—plaintiff here was simply living "comfortably" in the same home as his grandfather when the brutal murder occurred. These circumstances warrant an enhancement to the standard *Heiser* valuation.

*Subsequent Events*

As has been chronicled above, General Oveissi was in a position of power and influence, even after his departure from Iran, and thus was seen as a threat to the current Iranian regime. *Id*. And his death, unlike many of the terrorist attacks that have come before the courts in FSIA litigation, was not the result of a planned but non-specific terrorist attack designed to inflict maximum casualties generally, but rather was caused by a deliberate and focused assassination in which General Oveissi was the specific target. *Id*. As a result, immediately following General Oveissi's assassination, his family—including plaintiff—were forced to live under the constant threat of further reprisals, unable to take the significant period of time that is generally necessary to cope with the immense tragedy they had just suffered.

Thus, unlike many family members of terrorist attacks—who suffer incredible losses but, at minimum, are generally able to grieve with their families and friends, often in the comfort and

safety of their own homes in the United States—plaintiff here, a child of less than six years, was immediately uprooted from his home, and whisked away to a foreign land.  *See id.*  In addition, plaintiff's family—fearing further attacks against them as reprisals for General Oveissi's position and activities—were forced to enter hiding and hire armed guards to stand full-time watch over them.  Thus plaintiff was unable to grieve in any natural or comforting manner, but instead was forced to live under the constant threat of death, surrounded by armed bodyguards and hidden away in unknown and foreign locations.  *See id.*  Naturally, in such circumstances plaintiff's ability to cope with this enormous tragedy was greatly stunted, and he withdrew from the world, fighting battles alone against bouts of outrage and depression.  *Id.*  These dire circumstances amplified the effects of the grief that any family member of a victim of a terrorist plot would naturally suffer, and thus warrants a further departure from the *Heiser* framework.

*Feelings of Permanent Loss and Substantial Change*

Taken together, the circumstances detailed above, along with his grandfather's death, had a significant impact on Amir Reza Oveissi.  As a young child, plaintiff changed significantly, turning from a happy and outgoing boy to a withdrawn and solemn figure.  *Id.*  He suffered from fits of anger, and to this day has never been able to discuss his grandfather's death openly with his family.  *Id.*  As he grew older, Amir Reza grew more and more depressed, and turned to alcohol in a misguided attempt to cope with the pain of his loss and the subsequent trauma from which he suffered.  *Id.*  And as an adult, plaintiff continues to suffer sadness and anger, and these events have steered him to pursue particular studies and fields of practice linked to both his grandfather and Iran.  *Id.*  Though these subjects tend only to amplify the pain he still feels, plaintiff explained that he is "compelled" to constantly remember Gholam's assassination, as that event, in his own words, "defined who he is today."  Amir Reza 1st Decl. at ¶ 25.  This lifetime

of suffering constitutes the exact sort of acute feeling of "permanent loss or change caused by decedent's absence" that warrants an upward departure from the standard *Heiser* valuation. *Valore*, 700 F. Supp. 2d at 86.

In determining the final award for solatium in this case, the several factors highlighted by plaintiff suggest that an enhanced damage award is appropriate. The Court, however, must also remain mindful of the general equitable principle that claims for pain and suffering "should be compared to awards in similar cases." *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 55 (D.D.C. 2009). Plaintiff, in his briefing to the Court, takes the position that the circumstances involved in this case justify a solatium award of $10 million. Damage Estimate at 5–15. As chronicled above, plaintiff is correct in his assertion that several factors point to an award exceeding the amount indicated by the *Heiser* framework—$5 million. At the same time, a review of awards in other FSIA cases indicates that not only is such a request—which is equivalent to a 100% enhancement—out of line with other FSIA awards, but it is entirely unprecedented.

A comparison with other terrorist victim's suggests that the Court must temper its total enhancement in this case. In *Valore*, for example, this Court considered the claims of two family members of individuals injured or killed in the 1996 bombing of a U.S. military residence at Khobar Towers in Saudi Arabia. There, the evidence demonstrated that one of the family members suffered "several nervous breakdowns, at least one of which required hospitalization," while another victim suffered the horrific fate of losing not one but two family members—a husband and a brother. *Valore*, 700 F. Supp. 2d at 86. Yet despite the terrible losses suffered— and the lingering mental disabilities caused by those losses—this Court found that a 25% upward departure was the maximum allowable in each particular case. *Id*. Similarly, this Court has

found that 40% departures were warranted in (1) a case where one family member testified that her life was irrevocably changed by the attack, *Haim*, 425 F. Supp. 2d at 75, and (2) a case where the family member was forced to quit her job and become the full-time caretaker of her now-quadriplegic child. *Blais*, 459 F. Supp. 2d at 60. In light of these awards, but also cognizant of the several factors that indicate that a damage award larger than the one established by the *Heiser* scale is appropriate, the Court finds that the circumstances here warrant a 50% enhancement. Thus, the Court awards plaintiff $7.5 million in solatium damages for the loss of his grandfather, which resulted from the heinous murder that defendants planned and ordered.[12]

### B. Economic Loss

In addition to damages for solatium, plaintiff seeks to recover for alleged economic losses that he suffered as a result of his grandfather's murder. Damage Estimate at 2–4. Awards for economic loss are permitted under the FSIA, *Flatow*, 999 F. Supp. at 28, and are a traditional remedy for wrongful death actions. *See id*. at 27 ("[A] wrongful death statute is designed to compensate decedent's heirs-at-law for economic losses which result from decedent's premature death."). The French law principle of *réparation intégrale* also permits recovery for such losses. *See* Bell *et al.*, *supra* at 412 (stating that French law recognizes and compensates "purely financial losses caused by another's personal injury"). Economic damages generally derive from lost wages and earnings resulting from the death of, or debilitating injury to, the victim. *See, e.g.*, *Murphy*, ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 101250 at *68. Here, however, plaintiff asks the Court to compensate him for lost property that General Oveissi possessed in Iran prior to the 1979 revolution. In support of this request, plaintiff submits evidence that

---

[12] Plaintiff also seeks pre-judgment interest on his solatium damages. Damage Estimate at 15–16. This request will be denied. In adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, regardless of the timing of the attack. Here, the Court sees no reason to deviate from its standard practice. And to the extent plaintiff suggests that such interest is "necessary to fully compensate Mr. Oveissi for the enormous loss he sustained," *id*. at 15, the Court notes that the upward adjustments from the *Heiser* valuation fulfill this very function. *See supra* Section III.A.2.

Gholam Oveissi was a wealthy and powerful figure who owned several homes, significant land, two farms and significant water rights prior to his exile. *See supra* Section II.B. The approximate values of these properties and assets are provided by plaintiff's father, who acted as a manager of the estates. This testimony establishes that while in Iran, General Oveissi owned assets totaling roughly $749,000,000. *Id.* Plaintiff argues that defendants' "murder of Gholam Oveissi foreclosed Gholam Oveissi's ability to recover his property so that it could eventually be distributed by Gholam Oveissi to his heirs"—including plaintiff. Supp. Br. at 2.

FSIA actions, which incorporate concepts of wrongful death and survival, limit recovery to "economic losses which *result* from decedent's premature death." *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 27 (D.D.C. 2008); *see also Valore*, 700 F. Supp. 2d at 83 ("[E]states of those who did not survive can recover economic losses *stemming* from wrongful death of the decedent.") (emphasis added). To demonstrate that particular losses "result" from a person's premature death, a plaintiff must establish causation as both a factual and legal matter. The factual inquiry examines whether the alleged losses would have occurred irrespective of the tortious acts in question. *See Humane Soc'y v. Johanns*, No. 06 Civ. 265, 2007 U.S. Dist. LEXIS 27674 at *33 (D.D.C. Apr. 13, 2007) ("Under this Circuit's precedent, the harms to each party are tested for[, *inter alia*], likelihood of occurrence.") (quotations omitted). The test requires a plaintiff to establish that, had the incidents in question not occurred, the losses would not also have occurred. The legal inquire requires a plaintiff to show that that the actions in question were the legal cause of the alleged harms. *See* Restatement (Second) of Torts § 281 ("The actor is liable for an invasion of an interest of another, if, [*inter alia*,] the actor's conduct is a *legal cause* of the invasion.") (emphasis added). Under D.C. Circuit precedent and the FSIA, this requirement manifests in the principle of proximate cause. "Proximate cause exists so long as

there is some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Brewer*, 664 F. Supp. 2d at 54. (quotations omitted). Thus, plaintiff here must demonstrate that defendants' murder of General Oveissi caused—both as a matter of fact and a matter of law—the losses he suffered to his inheritance.

As chronicled above, plaintiff has submitted substantial evidence in support of his theory that General Oveissi (and thus derivatively, plaintiff), might have been able to reassert his property rights over his former assets located in Iran. *See supra* Section II.C. The Court need not speculate, however, as to the likelihood that—had he not been assassinated—General Oveissi could have rallied sufficient support to overthrow the revolutionary government in Iran and, as a result, reassert his property rights. Whatever the strength of the factual underpinnings of this claim, plaintiff is also under an obligation to establish that defendants' actions were the legal cause of these losses in the first instance. Here, however, the loss of these assets occurred five years before the death of General Oveissi, when he and his family were forced to flee Iran. After that period—and thus at the time of his assassination—Gholam Oveissi no longer exercised control over his former property in Iran.[13] Thus, though General Oveissi's assassination may have prevented him from recovering assets that he had previously lost, the murder did not actually *cause* him to lose those assets. Instead, his flight from Iran *resulted* in the loss of control over his former assets.

The evidence confirms that the 1979 revolution and General Oveissi's flight from Iran were the legal causes of the losses. For example, plaintiff's father, who provides extensive testimony concerning the properties and businesses in Iran drawn from his experiences overseeing those assets, declares that he "managed the real estate holdings owned by . . . Gholam

---

[13] The Court emphasizes that this statement is limited to the observation that Gholam Oveissi did not, at the time of his death, have control over his formerly-held property. The Court expresses no opinion as to whether he might—and may still—have any legal claims to the property which might be cognizable in an appropriate forum.

Oveissi in Iran *through the date that my father and our family fled Iran*." Mohammad 1st Decl. ¶ 2 (emphasis added). Mohammad Oveissi also provides estimations for the values of his father's former assets in 1979 currency, *id*. at ¶¶ 4–8; presumably because he no longer had the ability to value these assets as of General Oveissi's death in 1984.[14] And at no point does plaintiff present evidence—or otherwise claim—that Gholam Ovessi or any member of his family exercised control over the assets after his flight from Iran in 1979. Indeed, plaintiff's father explains what the distribution of assets would have been "*[h]ad* . . . Gholam Oveissi lived long enough to *reclaim* his property in Iran," Mohammad 2d Decl. ¶ 3 (emphasis added)—an implicit acknowledgment that, at the time of his death, Gholam did not have possession of those assets, but would have needed to "reclaim" them. This is no surprise; the very same report that plaintiff submits to the Court as evidence of Gholam Oveissi's influence in exile also explains that, prior to the assassination, the Chairman of Iran's Revolutionary Court announced that General Ovessi and others were "in Iran's view . . . all criminals, [and] are condemned to death." IHRDC Report at 24. This message makes clear that General Oveissi no longer had any legal rights in Iran and lost control over his assets following the 1979 revolution. Thus, while Gholam Oveissi's murder may have prevented his attempt to reclaim the assets, the assassination certainly was not the *legal cause* of his losses in the first instance.

Plaintiff's attempt to depict this suit as a survival action in which he can assert a claim for property on behalf of his grandfather also lacks a legal basis. As an initial matter, a survival claim is not a form of recovery, but rather a distinct claim permitting "representatives of a deceased person [to] institute an action for tort after the plaintiff's death," Restatement (Second)

---

[14] Though not evidence, the Court also notes that plaintiff himself, when calculating lost revenue streams from the farms and water rights once possessed by General Oveissi, counts thirty-one years' worth of losses—effectively requesting compensation for losses from 1979 and on. Damage Estimate at 4. Plainly, the murder of Gholam Oveissi in 1984 could not have caused losses in revenue that occurred *prior* to his death. This calculation is, therefore, at minimum a tacit admission that the revenue and assets of Gholam Oveissi were lost as a result of the family's flight from Iran in 1979, and not Gholam's murder in 1984.

of Torts § 926 cmt. a, and the Court is unconvinced that plaintiff's Amended Complaint sets forth such a distinct claim. *See generally* Amended Complaint at ¶¶ 9–17 (setting forth claims for "Wrongful Death," "Loss of Solatium," "Intentional infliction of Emotional Distress," and "Punitive Damages"). More importantly, however, this Court in *Oveissi III* explained that its jurisdiction under the FSIA is limited to claims for "money damages . . . *for personal injury or death* that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support . . . for such an act." ___ F. Supp. 2d at __, 2010 U.S. Dist. LEXIS 120168 at *13 (emphasis added). This statutory limit provides that courts are only cognizant to consider claims linked directly to acts of state-sponsored terrorism—a limitation designed to preserve the general principle of foreign sovereign immunity found in the FSIA. Thus, adhering to the narrow and well-defined scope of the Act, courts have strictly limited survival claims under § 1605(a)(7) to those for harm suffered between the time that a victim is injured by the terrorist attack at issue and their death. *See Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000) ("The courts have recognized that an action may be pursued under the FSIA for survival damages for the emotional distress and the pain and suffering resulting from acts of state sponsored terrorism.") (citing *Flatow*, 999 F. Supp. at 28; *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 8 (2000)); *see also id.* ("The general rule . . . is that damages are limited to those suffered during the period between injury and death."). Here, however, plaintiff is not seeking to recover for emotional or physical suffering that befell General Oveissi after being shot but prior to his death, but rather is seeking to assert legal claims he may have possessed over property located in Iran. Such a claim, however, is not a claim for harm arising from personal injury or death caused by a terrorist act, as the Court has already determined that Gholam Oveissi's murder was not the legal cause of those losses. *See supra*.

The Court therefore lacks jurisdiction under the FSIA to evaluate the merits of any separate claim Gholam Oveissi may have had over his former assets.

Nor does resort to French law alter this result. The law of France, like U.S. law, recognizes that a defendant's actions must be the cause of the harms suffered by a plaintiff. *See* Bell et al., *supra* at 412 (stating that French law awards only "purely financial losses *caused* by another's personal injury") (emphasis added). And as discussed above, the fundamental French law concept of *réparation intégrale* is a principle of restitution, the goal of which is to restore the plaintiff to the status quo *prior to the defendants' improper actions*. *See supra* Section III. Here, restoring the status quo would require a return to General Oveissi's exile in America and Paris— a time when he was plotting a counter-revolution, but also a time when he no longer had control over the property in Iran. Whether Generl Oveissi might have subsequently reclaimed his rights sometime after 1984 had he not been killed is pure speculation, and thus cannot provide a substantive legal basis upon which to award extensive damages for the property that he undisputedly lost control over in 1979.

## VI.    CONCLUSION

For over seven years now, plaintiff has worked admirably and—given that the current ruling regime in Iran is the same one that ordered the assassination of his grandfather—bravely to call defendants to account for their role in the heinous murder of his grandfather. While the Court applauds plaintiff's willingness to stand against defendant's malicious and evil acts, it also remains constrained by the limits of applicable law. Here, the Court is empowered to compensate plaintiff for the loss of a close guardian and loving father-figure; it cannot, however, compensate him for property rights that his grandfather did not possess at the time of his death. In conclusion, the Court hopes plaintiff will find some measure of closure with the resolution of

this matter, and can only further hope that this sanction will serve as another rebuke of Iran's participation in acts of terrorism which may prevent such tragic events in the future.

A separate Order and Judgment consistent with these findings shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 8, 2011.